**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

COBEY LAKEMPER,

*Plaintiff – Appellant*,

v.

TODD ISHEE, ET AL.,

*Defendants – Appellees*.

On Appeal from
The United States District Court for the Eastern District Of North Carolina
Case No. 5:20-ct-03083-FL

**CORRECTED FORMAL OPENING BRIEF OF PLAINTIFF-APPELLANT**

DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

March 17, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ................................................................................................ 1

STATEMENT OF ISSUES ................................................................................ 3

STATEMENT OF THE CASE ........................................................................... 4

    I.     NCDAC's Prison Legal Speech Ban ........................................................ 4

    II.    NCDAC's Practice of Interfering with Mail Containing Legal Material .... 8

    III.   Defendant Owens's Retaliation Against Plaintiff ..................................... 10

    IV.   Procedural History .................................................................................. 16

SUMMARY OF ARGUMENT ......................................................................... 18

STANDARD OF REVIEW .............................................................................. 19

ARGUMENT .................................................................................................... 20

    I.     THE DISTRICT COURT MISCONSTRUED THE RELEVANT LEGAL
        STANDARDS AND IMPROPERLY DREW FACTUAL INFERENCES IN
        DEFENDANTS' FAVOR IN AWARDING SUMMARY JUDGMENT ON
        THE LEGAL SPEECH BAN CLAIM. ............................................ 20

        A.    Offense C20's Text Prohibits Nearly All Legal Speech, as Confirmed
            by its Application to Plaintiff and Other Incarcerated Individuals. ............ 23

        B.    The Legal Speech Ban Is Not Justified by Defendants' Purported
            Penological Interests Under *Turner*. .......................................... 26

           1. Neither common sense nor record evidence establish a rational
             connection between the legal speech ban and Defendants' penological
             interests ........................................................................................ 26

2. Plaintiff and his peers have no adequate alternative to exercise their First Amendment right to communicate with other incarcerated individuals about legal matters...............................................30

3. Permitting legal speech would not burden prison administrators.......34

4. Alternative regulations furthering Defendants' penological aims already exist.............................................................35

II.     THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S MAIL INTERFERENCE CLAIM. ...............36

    A.     Defendant Ishee Is Liable for TextBehind's Conduct. ......................37

    B.     There Exists a Genuine Issue of Material Fact as to Whether TextBehind Maintains an Unconstitutional Custom of Rejecting Non-Privileged Legal Material..........................................................41

III.    THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM. .............................44

    A.     Plaintiff's Lawsuits Were Protected First Amendment Activity. .......45

    B.     The District Court Misconstrued the Relevant Legal Standard and Improperly Drew Inferences in Defendant Owens's Favor When It Concluded that Plaintiff Did Not Suffer an Adverse Action......................46

    C.     Disputed Issues of Fact Exist as to Whether Defendant's Proffered Rationale for Denying the Special Draw Request Was Pretextual. ............51

CONCLUSION .......................................................................56

REQUEST FOR ORAL ARGUMENT...................................................56

CERTIFICATE OF COMPLIANCE .....................................................57

CERTIFICATE OF SERVICE............................................................58

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*ACLU of Md., Inc. v. Wicomico Cnty.*,
   999 F.2d 780 (4th Cir. 1993) ................................................................46, 49

*Altizer v. Deeds*,
   191 F.3d 540 (4th Cir. 1999) ........................................................................40

*Ancata v. Prison Health Servs., Inc.*,
   769 F.2d 700 (11th Cir. 1985) ................................................................38, 40

*Barkes v. First Corr. Med. Inc.*,
   766 F.3d 307 (3d Cir. 2014) ........................................................................39

*Board of Cnty. Comm'rs v. Umbehr*,
   518 U.S. 668 (1996) ......................................................................................47

*Bolding v. Holshouser*,
   575 F.2d 461 (4th Cir. 1978) ........................................................................42

*Booker v. S.C. Dep't of Corr.*,
   855 F.3d 533 (4th Cir. 2017) ........................................................................46

*Bryan v. Werner*,
   516 F.2d 233 (3d Cir. 1975) ........................................................................34

*Burke v. Regalado*,
   935 F.3d 960 (10th Cir. 2019) ......................................................................39

*City of Houston v. Hill*,
   482 U.S. 451 (1987) ......................................................................................24

*Conner v. Donnelly*,
   42 F.3d 220 (4th Cir. 1994) ....................................................................39, 40

*Constantine v. Rectors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ..............................................................46, 47, 48

*Foster v. Univ. of Md.-E. Shore*,
787 F.3d 243 (4th Cir. 2015) ...............................................................51

*Gill v. Rollins Protective Servs. Co.*,
773 F.2d 592 (4th Cir. 1985) ...............................................................20

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
218 F.3d 337 (4th Cir. 2000) ...............................................................38

*Greenhill v. Clarke*,
944 F.3d 243 (4th Cir. 2019) ...............................................................21

*Griffin v. Bryant*,
56 F.4th 328 (4th Cir. 2022) ..................................................... Passim

*Hammer v. Ashcroft*,
512 F.3d 961 (7th Cir. 2008) ...............................................................23

*Haze v. Harrison*,
961 F.3d 654 (4th Cir. 2020) ...............................................22, 27, 28

*Heyer v. U.S. Bureau of Prisons*,
849 F.3d 202 (4th Cir. 2017) ...............................22, 31, 32, 33

*Heyer v. U.S. Bureau of Prisons*,
984 F.3d 347 (4th Cir. 2021) ...............................................31, 32

*Hill v. Lockheed Martin Logistics Mgmt.*,
354 F.3d 277 (4th Cir. 2004) ...............................................................45

*Holmes v. Godinez*,
311 F.R.D. 177 (N.D. Ill. 2015) ...............................................................41

*Hudspeth v. Figgins*,
584 F.2d 1345 (4th Cir. 1978) ...............................................................47

*Hum. Rts. Def. Ctr. v. Ishee*,
726 F. Supp. 3d 482 (E.D.N.C. 2024) ...............................................31, 43

*Jehovah v. Clarke*,
    798 F.3d 169 (4th Cir. 2015) ................................................................22

*Jones v. Caruso*,
    569 F.3d 258 (6th Cir. 2009) .................................................22, 34, 35

*Jones v. Hamilton*,
    2024 WL 1959289 (W.D. Va. May 2, 2024)......................................42

*Jones v. Slade*,
    23 F.4th 1124 (9th Cir. 2022) .........................................................27, 29

*Jones v. Solomon*,
    90 F.4th 198 (4th Cir. 2024) ....................................................47, 48, 50

*Kensu v. Haigh*,
    87 F.3d 172 (6th Cir. 1996) ................................................................37

*King v. Kramer*,
    680 F.3d 1013 (7th Cir. 2012) ...........................................................40

*Kopf v. Wing*,
    942 F.2d 265 (4th Cir. 1991) .............................................................41

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    456 F. Supp. 3d 699 (D. Md. 2020).............................................38, 39

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...........................................................................49

*Lumumba v. Kiser*,
    116 F.4th 269 (4th Cir. 2024) ..................................................21, 23, 24

*Lytle v. Doyle*,
    326 F.3d 463 (4th Cir. 2003) .............................................................41

*Market Co. v. Hoffman*,
    101 U.S. 112 (1879) ...........................................................................24

*Martin v. Duffy*,
   858 F.3d 239 (4th Cir. 2017) ..........................................................45, 46

*Martin v. Duffy*,
   977 F.3d 294 (4th Cir. 2020) ........................................................ Passim

*Moss v. Harwood*,
   19 F.4th 614 (4th Cir. 2021) ..........................................................19, 33

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...............................................................25

*Peltier v. Charter Day Sch., Inc.*,
   37 F.4th 104 (4th Cir. 2022) .................................................................38

*Pendleton v. Jividen*,
   96 F.4th 652 (4th Cir. 2024) .................................................................20

*Richardson v. Clarke*,
   52 F.4th 614 (4th Cir. 2022) .................................................................22

*Savoy v. Bishop*,
   706 F. App'x 786 (4th Cir. 2017) ........................................................45

*Scott v. Clarke*,
   64 F. Supp. 3d 813 (W.D. Va. 2014) ........................................38, 39, 41

*Shaw v. Murphy*,
   532 U.S. 223 (2001) ......................................................................21, 22

*Smith v. CSRA*,
   12 F.4th 396 (4th Cir. 2021) .......................................................51, 53, 55

*Suarez Corp. Indus. v. McGraw*,
   202 F.3d 676 (4th Cir. 2000) .......................................................47, 48, 50

*Thaddeus-X v. Blatter*,
   175 F.3d 378 (6th Cir. 1999) ..........................................................46, 47

*Thornburgh v. Abbott*,
   490 U.S. 401 (1989) ........................................................27, 31, 36, 40

*Turner v. Safley*,
   482 U.S. 78 (1987) ................................................................. Passim

*Wall v. Wade*,
   741 F.3d 492 (4th Cir. 2014) .............................................................22

*West v. Atkins*,
   487 U.S. 42 (1988) .........................................................................37

*Williams v. Mitchell*,
   122 F.4th 85 (4th Cir. 2024) ..............................................................49

*Wolf v. Ashcroft*,
   297 F.3d 305 (3d Cir. 2002) ..............................................................30

*Wolff v. McDonnell*,
   418 U.S. 539 (1974) .......................................................................32

## Statutes

28 U.S.C. § 1291 ...............................................................................3

28 U.S.C. § 1294 ...............................................................................3

28 U.S.C. § 1331 ...............................................................................3

42 U.S.C. § 1983 ...................................................................... Passim

N.C. Gen. Stat. § 84-4 (2025)..............................................................4

N.C. Gen. Stat. § 84-8 (2025)..............................................................4

## Rules

Fed. R. Civ. P. 56(a) .........................................................................20

**Other Authorities**

*Assist*, Merriam-Webster Collegiate Dictionary (11th ed. 2003) ............................ 24

*Assist*, Black's Law Dictionary (6th ed. 1990) ........................................................ 24

*Book Donations for Corr. Librs.*, Md. Dep't of Pub. Safety,
https://dpscs.maryland.gov/corrections/book_donations.shtml#:~:text=Correction
al%20Education%20libraries%20provide%20incarcerated,Workforce%20Develo
pment%20and%20Adult%20Learnin (last visited Mar. 7, 2025) .......................... 6

Md. Code Regs. 12.03.01.04 (2018),
https://www.law.cornell.edu/regulations/maryland/COMAR-12-03-01-04 .......... 6

S.C. Dep't of Corr., GA-01.03, Inmate Access to the Cts. 1 (Dec. 9, 2015),
https://doc.sc.gov/sites/doc/files/Documents/policy/GA-01-03.pdf ...................... 6

S.C. Dep't of Corr., OP-22.14, Inmate Disciplinary Sys. (Feb. 2, 2015),
https://doc.sc.gov/sites/doc/files/Documents/policy/OP-22-14.pdf ....................... 6

Va. Dep't of Corr., Operating Proc. 861.1, Category II Code of Offenses 2 (2023),
https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-861-1-a3.pdf
........................................................................................................................... 6

Va. Dep't of Corr., Operating Proc. 866.3, Inmate & CCAP Probationer/Parolee
Leg. Access 6 (2022), https://vadoc.virginia.gov/files/operating-
procedures/800/vadoc-op-866-3.pdf ..................................................................... 6

W. Va. Div. of Corr. & Rehab., Pol'y Directive on Discipline of Inmates (Sept. 1,
2021), https://wvpolicy.org/wp-content/uploads/2024/01/325.00-Discipline-of-
Inmates-2021.09.01.pdf .......................................................................................... 6

*W. Va. State L. Libr Policies*, W. Va. Judiciary, https://www.courtswv.gov/public-
resources/law-library/policies (last visited Mar. 7, 2025) ..................................... 6

# INTRODUCTION

North Carolina is extreme in impeding incarcerated individuals' pursuit of legal knowledge and exercise of their First Amendment rights to communicate about legal issues. Having shuttered all law libraries in its prisons, the state has proceeded to suppress legal speech and knowledge through a combination of unconstitutional policies and practices. Plaintiff-Appellant Cobey LaKemper brings three related First Amendment claims: (1) a facial and as-applied challenge to North Carolina Department of Adult Correction's ("NCDAC") prohibition on nearly all legal speech; (2) a challenge to NCDAC's interference with Mr. LaKemper's receipt of mail containing legal papers through a third-party mail processing contractor; and (3) a claim against then-Warden Barney Owens for retaliating against Mr. LaKemper for his litigation against NCDAC by denying a request to access his personal funds to pay a paralegal service. The district court erred in granting summary judgment to Defendants-Appellees on all three claims.

As to the legal speech ban claim, the district court misconstrued the breadth of the prohibition and improperly accepted Defendants' alleged justifications for the policy. NCDAC prohibits incarcerated individuals from "[a]ssist[ing] another person with litigation or legal matters." On its face and in application, this ban suppresses legitimate non-disruptive legal speech, including even the discussion of legal concerns regarding confinement conditions. Mr. LaKemper himself has faced

sanctions for discussing legal matters with his peers. This policy goes far beyond other Fourth Circuit states to impermissibly single out and silence legal speech.

Regarding the mail interference claim, the district court misinterpreted the rules around liability for government defendants under 42 U.S.C. § 1983 and found that Defendant Ishee is not liable for the custom of mail obstruction resulting from the contract between NCDAC and TextBehind.com, Inc., the third-party contractor. Given uncontested evidence that TextBehind obstructs delivery of mail containing legal papers sent from family members or non-lawyers to Mr. LaKemper—without any legitimate penological justification—the district court erred when it granted summary judgment on this claim. On the retaliation claim, the district court made improper factual inferences for Defendant Owens and ignored the mountain of evidence indicating that his rationale for refusing to let Mr. LaKemper access legal resources was pretextual. It thus erroneously granted summary judgment on this claim notwithstanding genuine disputes of material fact.

When assessing all three claims, the district court failed to heed this Court's admonition that "it is not the role of the judiciary to erect substantive barriers to prisoners' civil rights actions." *Martin v. Duffy* (*Martin II*), 977 F.3d 294, 301 (4th Cir. 2020). Accordingly, this Court should reverse the district court's award of summary judgment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under a federal statute, 42 U.S.C. § 1983. On September 18, 2024, the district court entered a final order granting summary judgment for Defendants on all claims. JA750–774. On October 10, 2024, Plaintiff timely filed a Notice of Appeal, JA775–776, which this Court has jurisdiction over pursuant to 28 U.S.C. § 1291 and § 1294.

## STATEMENT OF ISSUES

1.  Whether the district court erred in awarding summary judgment to Defendants on Plaintiff's claim that NCDAC's legal speech ban violates the First Amendment as incorporated by the Fourteenth Amendment.

2.  Whether the district court erred in awarding summary judgment to Defendants on Plaintiff's claim that NCDAC's interference with his mail violates the First Amendment as incorporated by the Fourteenth Amendment.

3.  Whether the district court erred in awarding summary judgment to Defendants on Plaintiff's claim that Defendant Barney Owens retaliated against him for exercising his First Amendment rights as incorporated by the Fourteenth Amendment.

## STATEMENT OF THE CASE

### I.    NCDAC's Prison Legal Speech Ban

NCDAC is unique among states within the Fourth Circuit for singling out legal speech for punishment in correctional facilities. *See infra* at 6–7. Offense "C20" of the NCDAC[1] Offender Disciplinary Procedures prohibits incarcerated individuals from "[a]ssist[ing] another person with litigation or legal matters." JA118. No definition of the offense or its terms is provided. At the time Plaintiff initiated this lawsuit, those who violated the rule could be subject to 10 days lost credit time, 30 hours of "extra duty" work, the loss of two privileges for up to one month, and a limited weekly draw of $10 for up to one month, JA120, as well as criminal prosecution, JA438.[2]

Pursuant to this broad prohibition, NCDAC staff regularly penalize or threaten to penalize incarcerated individuals merely for discussing matters legal in nature. On four occasions, Mr. LaKemper had his legal papers confiscated and was required to perform 90 hours of "extra duty" work for discussing legal matters with his incarcerated peers. JA390. Ten of Plaintiff's peers also attested to facing sanctions or the threat of sanctions for discussing legal matters. JA395–398, JA401, JA403–

---

[1] Prior to 2023, the North Carolina prison system was operated by the North Carolina Department of Public Safety.

[2] *See* N.C. Gen. Stat. § 84-4 (2025) (prohibiting "any person or association of persons, except active members of the Bar" from "giv[ing] legal advice or counsel"); § 84-8 (classifying § 84-4 as a Class 1 misdemeanor).

406, JA409, JA412, JA414, JA417–418. Often, prison staff punish legal discussions without formally citing individuals for an offense. JA405–406, JA412. As a result, Mr. LaKemper and other incarcerated individuals across NCDAC's facilities frequently self-censor as to *all* legal speech, out of fear of discipline, formal or otherwise. JA389, JA395–399, JA401, JA403–406, JA409, JA412, JA414, JA417–418. Both the text of the policy and its enforcement thus confirm that Offense C20 constitutes a sweeping ban on legal speech across NCDAC's facilities.

Defendants do not contest the breadth of their legal speech ban.[3] *See* District Dkt. 83 at 4–5. Instead, their litigation position is that the prohibition furthers three penological interests: (1) preventing the unauthorized practice of law, (2) preventing the transfer of illicit information or contraband, (3) and preventing "extortion, bartering, or gang activities." JA349–350. However, Defendants cite no instances in which enforcement of the legal speech ban has resulted in the discovery of unauthorized practice, illicit information or contraband, or the bartering for legal services. *See* JA349–350, JA501–502. Additionally, other NCDAC rules already address these penological aims. NCDAC policy makes it an offense to "[v]iolate any law of the State of North Carolina," JA116 (B09), possess illicit materials or

---

[3] In defense of the policy, Defendants impliedly concede that the policy prohibits incarcerated individuals from seeking "legal assistance," "discussing legal matters with other inmates," and "exchanging non-disruptive legal speech." District Dkt. 83 at 4–5; JA73.

contraband, JA115 (A07, A16); JA116 (A24); JA117 (B19, C08); JA118 (C14, C15, C17, C21), "[b]arter or trade," JA117 (C09), and "offer to give or withhold anything to persuade another to . . . perform favors," JA140; JA115 (A15, A21).

The legal speech ban is part and parcel of NCDAC's extreme efforts to curtail incarcerated people's access to legal knowledge. No other state in the Fourth Circuit reaches as far as North Carolina to categorically ban incarcerated individuals from assisting with legal matters.[4] Only Virginia's prison disciplinary policy even references legal assistance, but prohibits only "[c]harging or accepting any compensation for legal assistance or for other services."[5] North Carolina is also unique within the Fourth Circuit for eliminating law libraries.[6] Until NCDAC

---

[4] *See* Md. Code Regs. 12.03.01.04 (2018), https://www.law.cornell.edu/regulations/maryland/COMAR-12-03-01-04; S.C. Dep't of Corr., OP-22.14, Inmate Disciplinary Sys. (Feb. 2, 2015), https://doc.sc.gov/sites/doc/files/Documents/policy/OP-22-14.pdf; W. Va. Div. of Corr. & Rehab., Pol'y Directive on Discipline of Inmates (Sept. 1, 2021), https://wvpolicy.org/wp-content/uploads/2024/01/325.00-Discipline-of-Inmates-2021.09.01.pdf.

[5] Va. Dep't of Corr., Operating Proc. 861.1, Category II Code of Offenses 2 (2023), https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-861-1-a3.pdf.

[6] *See W. Va. State L. Libr Policies.*, W. Va. Judiciary, https://www.courtswv.gov/public-resources/law-library/policies (last visited Mar. 7, 2025); *Book Donations for Corr. Librs.*, Md. Dep't of Pub. Safety, https://dpscs.maryland.gov/corrections/book_donations.shtml#:~:text=Correctional%20Education%20libraries%20provide%20incarcerated,Workforce%20Development%20and%20Adult%20Learnin (last visited Mar. 7, 2025); S.C. Dep't of Corr., GA-01.03, Inmate Access to the Cts. 1 (Dec. 9, 2015),

distributed digital tablets containing a rudimentary law library application in October 2021, Mr. LaKemper was provided no institutional access to legal material. JA388. Even now, the tablet remains difficult to navigate, and internet outages and equipment malfunctions impede reliable access. JA388–389.

Although Defendants assert that access to North Carolina Prisoner Legal Services ("NCPLS") provides a comprehensive means of legal assistance, the organization routinely declines to provide even the most basic services like legal research due to inadequate resources. JA434. Per record evidence, in every instance plaintiff has contacted NCPLS for legal assistance, his request has been denied. JA434, JA439–446. NCPLS has only aided in conducting discovery in this litigation pursuant to a court order. District Dkt. 30, 49. In 2015, NCPLS stated that it was categorically unable to assist incarcerated individuals with claims regarding their conditions of confinement. JA440. Mr. LaKemper otherwise has limited opportunities and external contacts with whom to discuss legal matters. App. Dkt. 7 at 8. Moreover, Defendants have obstructed his ability to correspond with third parties about legal matters by interfering with his mail and retaliating against him. *See infra* at 8, 10.

---

https://doc.sc.gov/sites/doc/files/Documents/policy/GA-01-03.pdf; Va. Dep't of Corr., Operating Proc. 866.3, Inmate & CCAP Probationer/Parolee Leg. Access 6 (2022), https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-866-3.pdf.

Frustrated by these circumstances, Mr. LaKemper exhausted several grievances through NCDAC's Administrative Remedy Procedure ("ARP") related to the legal speech ban. On October 3, 2015, Mr. LaKemper filed a grievance concerning the "[free] speech implications" of the C20 policy. JA387–388. On December 14, 2019, Mr. LaKemper filed a grievance asserting that the blanket ban on law libraries along with the lack of any "reasonable substitute" for obtaining legal information violated his constitutional rights. JA430–433.

## II. NCDAC's Practice of Interfering with Mail Containing Legal Material

In October 2021, departing from the longstanding practice of mailroom staff inspecting and processing all incoming mail, Defendant Ishee amended NCDAC policy to require that all personal mail be processed through third-party contractor TextBehind.com, Inc. ("TextBehind"). JA71–72, JA99–100, JA448. Under the amended policy, personal mail must be sent to TextBehind, which scans and digitizes the mail for the facility. JA99–100. However, the policy still requires "legal mail" to be sent directly to the correctional facility. JA100. The policy defines "legal mail" according to the identity of the sender or recipient, and includes "[m]ail to and from attorneys, paralegals working at the direction of attorneys, state and federal courts, the Attorney General of the United States or the Attorney General of North Carolina, the judiciary, the Industrial Commission, consular officials, or legal aid services." JA97. Copies of legal research or material from family or from

independent paralegal services is not considered legal mail under the amended policy. *Compare* JA450 *with* JA97.

TextBehind's policies do not define "legal mail" but state that it does not process "privileged mail," or mail sent by a "practicing attorney or a public official." JA113. Otherwise, TextBehind supposedly processes "any communication sent by a family member, friend, inmate, organization, or educator regardless of its content." JA113. In combination, NCDAC's and TextBehind's policies mean that any legal materials sent by family or an independent paralegal to an incarcerated person are non-privileged and must be processed through TextBehind. *See* JA96–113.

Shortly after the promulgation of the amended mail policy, Mr. LaKemper learned that he was required to send photocopies of documentary material for a case he had filed before the North Carolina Industrial Commission. JA41. Because the prison prohibits incarcerated individuals from accessing copy services, Mr. LaKemper was required to turn to an independent paralegal service, Elite Paralegal Services ("EPS"), to obtain copies of legal material for litigation purposes. JA41, JA291. Although he requested that the service be allowed to send paper copies directly to the facility, prison mailroom staff stated that the copies must be sent via TextBehind. JA42. When EPS mailed the copies, TextBehind rejected it saying they "do not process legal mail," and the material has been lost since. JA42.

This episode was not an anomaly. On four other occasions between January 2022 and January 2024, copies of legal material sent by non-lawyers to TextBehind were never delivered to Mr. LaKemper. JA392. Uncontested evidence also indicates that other incarcerated individuals regularly fail to receive non-privileged mail containing legal papers sent through TextBehind. *See* JA400 (undelivered mail containing "case law, a prisoner litigation manual, copies from [his] current appeal, and a packet from [the] Internet [about] how to prepare a record on appeal"); JA395, JA410 (legal papers returned to family member senders). This practice prevented them from filing pro se motions and attaching exhibits, affidavits, and documentary material to filings. *See* JA401–404.

On August 9, 2022, Mr. LaKemper exhausted a grievance claiming he was precluded from receiving legal materials from vendors, family, or friends because of TextBehind's rejection of all material legal in nature. JA294.

### III.   Defendant Owens's Retaliation Against Plaintiff

Mr. LaKemper has utilized EPS's photocopying and legal research services since 2012. JA392. In 2017, he opened a standing "account" with EPS to pay for these services. JA392. On December 18, 2020, Plaintiff was transferred to Pamlico Correctional Institution ("PCI"), District Dkt. 78 at 16 (citing JA465–466), where Defendant Owens was warden. JA358. At the time, Plaintiff maintained three actions against NCDAC: a negligence tort claim concerning the suspension of "Sick Call"

policies at a different NCDAC facility, a tort claim concerning lost property, and the instant lawsuit. District Dkt. 78 at 17 n.13. On April 15, 2021, Mr. LaKemper submitted a "Request for Special Draw" form to Unit Manager Earnest Riggs requesting that $900 be transferred from his Trust Fund Account to EPS in order to fund legal research and obtain photocopies required for these claims. JA23, JA32–33, JA483.

Subsection IV(a) of NCDAC's Standard Operating Procedure on special draw requests ("Special Draw SOP")[7] provides that "inmates" may request funds from their accounts to pay for goods or services:

> Offenders may request approval for a special draw from their Trust Fund Account for such purposes as to help support dependents, pay an attorney or other legitimate creditor, procure articles authorized under Department regulations and policies, transfer of funds from one inmate's account to another, and to open a savings account in accordance with Departmental Policies.

JA146–147. This is not an exhaustive list of permissible special draw requests. In practice, for example, articles other than those explicitly authorized by the policy are routinely approved, including Dungeons & Dragons paraphernalia and swimsuit calendars. JA393.

---

[7] In discovery, Defendants provided only the SOP issued on June 30, 2021. *See* JA517–518. Plaintiff knows of no relevant changes to the policy between April 15, 2021, the date Mr. LaKemper requested special draw, and June 30, 2021, and Defendants do not contest this. *See* JA73.

Subsection IV(f) of the Special Draw SOP, titled "Offender Responsibility,"

lists requirements if an individual seeks to send money to specific recipients:

(1) The offender will fill out the request form with the dollar amount to be withdrawn from his account, including the bank's fee . . . attach a stamped self-addressed envelope . . . [and] note on the outside of the form that the request is to be forwarded to the Trust Fund Clerk.

(2) If the offender is sending money to an individual, proper documentation must be attached, along with written justification. Examples of acceptable documentation would be a bill, invoice, or statement. The individual should be on the offender's approved visitor's list. . . .

(3) If the offender is sending money to a church, organization, or any type of group proper documentation must be attached, along with written justification. Examples of acceptable documentation would be a bill, invoice, or statement.

(4) If the offender's request is for any purchase that requires a completed order form enclosed with payment, the order form must accompany the [request] and must be from the company. The order form may not be handwritten.

(5) If the offender is ordering books, magazines, newspapers, or photographs, the Offender Request for Additional Personal Property must be completed . . . .

(6) Policy prohibits an offender from incurring debt while incarcerated. This means that full payment must accompany an order for a magazine, book, etc. The offender cannot place the order without payment [or] make monthly payments.

JA147–148. Section IV(f) does not enumerate specific requirements for depositing

funds into a business account for future use.

12

Per the SOP, a special draw request is sent to the Trust Fund Office to "verify that funds are available" in the incarcerated individual's trust account, then forwarded to the "Facility Head"—in this case, Defendant Owens—for approval. JA148, JA359. If the Facility Head does not approve, they are to explain "the reason for the disapproval . . . on the request form and [return it] to the Trust Fund Clerk, who will then return the disapproved request" to the individual. JA148.

Plaintiff submitted a completed special draw request form on April 15, 2021. JA483. In the "Purpose" field, Mr. LaKemper wrote, "Perform legal research and provide legal materials and copies. I have three pending lawsuits against [NCDAC] and need the services of EPS in order to litigate, particularly since NCPLS does NOT provide assistance." JA483. Later that day, Unit Manager Riggs approved Plaintiff's special draw request, writing "It's a business" in the margin of the form. JA483. However, Riggs's approval was not final; as warden of PCI, Defendant Owens was ultimately responsible for approving or disapproving the request. JA148, JA359.

On April 28, 2021, after nearly two weeks of waiting for the photocopies and legal services he had ordered, Plaintiff asked Riggs for an update. JA22. Plaintiff recalls that Riggs called Defendant Owens and then relayed Owens's message to Mr. LaKemper that Owens had denied the request because funds could not be sent for "future use." JA22. Riggs added that, to his knowledge, Owens had never before denied a special draw request. JA393. Riggs then provided Plaintiff with a denial

letter from Theresa Freeman of PCI's Trust Fund Office, dated April 27, which stated that "[m]oney cannot be sent to open accounts for future use." JA487. The Special Draw SOP does not contain a prohibition on sending funds for "future use." *See* JA146–150. Given that he had successfully sent personal funds to EPS from other NCDAC facilities several times, JA23, JA392, Plaintiff filed a grievance regarding the denial that same day. JA251.

On May 4, 2021, Plaintiff received a "Step One" grievance response, which provided a different reason for the rejection. The response stated that policy required him to submit "proper documentation," such as a "bill, invoice, or statement," and a "written justification as to why." JA250. The response also cited the prohibition on "incurring debt," but did not mention any prohibition on sending funds for "future use." JA250.

Later that day, Plaintiff spoke to Owens's administrative assistant, Sherri Valerio, about the denial of his special draw request. Valerio told him that he would be "stupid to think" that the PCI Trust Fund Office would "release his funds to use in a 'lawsuit against [NCDAC],'" and that Mr. LaKemper would have been smarter to lie on the form. JA393.

On May 7, 2021, Defendant Owens provided an informal grievance response to Plaintiff, which provided additional and different justifications for denying the request: (1) that "[p]olicy prohibits an offender from incurring debt"; (2) that "[a]

14

statement or invoice should be provided with a request, along with a written statement"; and (3) that any request to "transfer . . . funds to a savings account" must specify "the name of the local financial institution" and that "[EPS] does not qualify as a local financial institution." JA488. Plaintiff appealed the grievance to "Step Two." JA652.

On May 18, Correctional Programs Director JaKee Wooten, managing the "Step Two" grievance response, emailed Theresa Freeman asking for a statement from the Trust Fund Office explaining the denial. JA656. On May 20, Wooten emailed Freeman again, asking for "clarity" on "why the money order was denied." JA655. The next day, Wooten sent Mr. LaKemper the "Step Two" response, which stated, in part, "Upon research of [EPS], it was discovered they are not a legal office, but an establishment that provides services. Offenders are only authorized to send money to licensed attorneys/legal agents." JA652. The response also excerpted Subsection IV(a) of the Special Draw SOP. JA652; *see also* JA146–147. Plaintiff appealed the grievance once again, and on May 27, 2021, he received a "Step Three" grievance response from another Grievance Examiner, which cited administrative concerns about contraband smuggling and stated that "[w]ardens may not be approving special draws for monies going directly to individuals" without a "bill, ticket or other documented debt." JA489.

In response to interrogatories in this case, Defendant Owens offered yet further differing responses. He claimed that he denied the request due to Mr. LaKemper's "not giving all information" and his failure to "complete the proper [paperwork] correctly." JA503. In a declaration, he later stated that he denied the request because he "did not feel [it] fit within one of the specified reasons to issue a special draw," it was "not accompanied by a bill, invoice, statement, or order form," and it was not an "attempt[] to pay a debt or procure articles authorized by Department policies." JA360.

As a result of the denial, EPS did not perform any legal research and returned the original documentary materials that Plaintiff had sent to be copied. JA690–691. On April 29, 2021, Plaintiff asked Defendant Owens if he could assist him in obtaining the legal copies, JA393, but Owens declined the request on May 24. JA490. Without the benefit of legal research or copy services, Mr. LaKemper was unable to effectively litigate his Industrial Commission case, and it was dismissed on November 14, 2021. JA393–394, JA770.

## IV. Procedural History

Mr. LaKemper commenced this action pro se on February 25, 2020, for violations of his civil rights pursuant to 42 U.S.C. § 1983. JA13–30. The operative complaint is the Amended Complaint, filed on August 25, 2021, along with two supplemental pleadings, filed respectively on November 19, 2021, JA31–36, and

February 28, 2022, JA38–044, which the district court incorporated into the Amended Complaint. JA46. On February 21, 2024, Defendants filed a motion for summary judgment. JA66–67.

On September 18, 2024, the district court granted summary judgment in Defendants' favor on all three claims. JA750–774. As to the legal speech ban claim, the court first found the policy "on its face" does not extend so far as to prohibit discussions of legal matters "in a broad sense." JA763. It then concluded that the policy was reasonably related to Defendants' penological interests under the test announced in *Turner v. Safley*, 482 U.S. 78 (1987). JA763–766. Regarding the mail interference claim, the court concluded that Defendants were not responsible for TextBehind's interference with Mr. LaKemper's mail, even though Defendant Ishee had specifically delegated mail processing functions to the contractor. JA766–768. Finally, the district court found that Defendant Owens's denial of Mr. LaKemper's special draw request did not constitute an adverse action for retaliation purposes and that the required evidence of retaliatory motive was missing. JA768–773.

On October 10, 2024, Mr. LaKemper timely filed a Notice of Appeal, challenging the district court's grant of summary judgment. JA775. Mr. LaKemper filed an informal opening brief on October 21, 2022. App. Dkt. 7. He subsequently secured pro bono counsel, and this Court issued a formal briefing schedule on December 6, 2024. App. Dkt. 16.

# SUMMARY OF ARGUMENT

The district court erred in awarding summary judgment to Defendants on each of Plaintiff's First Amendment claims.

1. *Legal Speech Ban.* The district court misinterpreted the scope of NCDAC's legal speech ban and overlooked disputed facts concerning whether the ban is unconstitutional as applied to Mr. LaKemper and whether it is facially overbroad. Per its text and in application, NCDAC's C20 policy bans providing encouragement regarding, offering opinions on, or participating in the discussion of any legal topic. The prohibition forbids vast swaths of non-disruptive legal speech, such as discussing recent legal developments, sharing generic information about the prison's grievance system, recommending a particular attorney, or even providing a declaration for this litigation. Under *Turner*, there is no valid, rational connection between singling out legal speech for punishment and Defendants' purported interests in preventing the unauthorized practice of law or illicit activities among the incarcerated. Existing NCDAC policies already prohibit the illicit conduct that concerns Defendants without suppressing additional speech, indicating the tenuous connection between the C20 policy and Defendants' purported justifications. Thus, summary judgment should be reversed.

2. *Mail Interference.* The district court misapplied § 1983 law and ignored disputes of material fact as to TextBehind's practice of depriving incarcerated

individuals of their non-privileged mail containing legal papers. By delegating the processing of prison mail—an exclusive prerogative of the state—to third-party contractor TextBehind, then-Commissioner of Prisons Defendant Ishee is liable for TextBehind's actions that violated Mr. LaKemper's constitutional rights. And because a reasonable factfinder could conclude that TextBehind has a practice of denying delivery of non-privileged legal materials, the district court erred in granting summary judgment on this claim.

3.    *Retaliation.* To litigate lawsuits against NCDAC, Plaintiff requested to send his own funds to EPS for legal research and copies of legal material. Defendant Owens denied the request. The district court's analysis of Mr. LaKemper's retaliation claim both misapplied the legal standard for "adverse action" and disregarded voluminous evidence that Defendant Owens's proffered rationale for denying Mr. LaKemper's special draw request was pretextual. The district court made inferences in favor of the moving party and resolved disputed issues of material fact in violation of the summary judgment standard, requiring reversal.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo* and draws factual inferences in favor of the party opposing the motion (here, Plaintiff Cobey LaKemper). *Moss v. Harwood*, 19 F.4th 614, 617, 621 (4th Cir. 2021). To affirm the district court's decision, there must be "no genuine dispute as to any

material fact," entitling the moving party to "judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985), *amended by* 788 F.2d 1042 (4th Cir. 1986) ("[S]ummary judgment 'should be granted only where it is *perfectly clear* that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.'" (emphasis added) (internal citation omitted)). Summary judgment is improper if there is a genuine, material dispute about the meaning and function of a prison's policy, "on paper and in practice." *Griffin v. Bryant*, 56 F.4th 328, 338 (4th Cir. 2022).

Additionally, this Court "read[s] the pleadings of a pro se plaintiff liberally and interpret[s] them to raise the strongest arguments that they suggest." *Martin II*, 977 F.3d at 298 (internal quotation marks and citation omitted). This standard applies even where a pro se plaintiff is subsequently represented by counsel on appeal. *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024).

## ARGUMENT

### I.  THE DISTRICT COURT MISCONSTRUED THE RELEVANT LEGAL STANDARDS AND IMPROPERLY DREW FACTUAL INFERENCES IN DEFENDANTS' FAVOR IN AWARDING SUMMARY JUDGMENT ON THE LEGAL SPEECH BAN CLAIM.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. Although prison

administrators may sometimes restrict incarcerated individuals' constitutional rights, such restrictions must be "reasonably related to legitimate penological interests." *Id.* at 89. NCDAC's overbroad legal speech ban fails this standard and is therefore an unconstitutional speech restriction both as applied to Plaintiff and on its face.

To justify restrictions on an incarcerated person's First Amendment right to communicate legal information with their peers, prison officials must satisfy the requirements outlined by the Supreme Court in *Turner*. *See Shaw v. Murphy*, 532 U.S. 223, 228 (2001) (evaluating incarcerated individuals' First Amendment right to provide legal advice to incarcerated peers under *Turner* framework). The same applies to overbroad prohibitions on speech. *See Lumumba v. Kiser*, 116 F.4th 269, 280 (4th Cir. 2024) ("[Incarcerated plaintiff] cannot bring an overbreadth challenge separate from *Turner*."). Under *Turner*, courts balance four considerations:

> (1) [W]hether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" [to the regulation in question].

*Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) (quoting *Turner*, 482 U.S. at 89–91). The first factor is the most important: "If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the

regulation fails, irrespective of whether the other factors tilt in [Defendant's] favor." *Shaw*, 532 U.S. at 229–30 (quoting *Turner*, 482 U.S. at 89–90). However, even if Defendants satisfy the first factor, the remaining considerations may suffice to render a prison policy unconstitutional. *See, e.g.*, *Jehovah v. Clarke*, 798 F.3d 169, 178–79 (4th Cir. 2015) (finding for Defendant on the first *Turner* factor but ruling for Plaintiff due to the last three factors).

Although courts afford "some deference" to prison officials when applying *Turner*, that deference is not limitless. *Richardson v. Clarke*, 52 F.4th 614, 621 (4th Cir. 2022). The Supreme Court and this Court have on numerous occasions found prison policies to violate incarcerated people's constitutional rights despite *Turner*'s requirement of deference. *See Turner*, 482 U.S. at 91, 94–100 (prohibition on marriage between incarcerated individuals absent approval); *Haze v. Harrison*, 961 F.3d 654, 658–59 (4th Cir. 2020) (practice of opening legal mail outside incarcerated person's presence); *Heyer v. U.S. Bureau of Prisons* (*Heyer I*), 849 F.3d 202, 214–18 (4th Cir. 2017) (failure to provide videophone access to deaf plaintiff in detention); *Jehovah*, 798 F.3d at 177–79 (ban on consuming communion wine); *Wall v. Wade*, 741 F.3d 492, 499–502 (4th Cir. 2014) (policy conditioning religious accommodations on "physical indicia of faith"); *see also Jones v. Caruso*, 569 F.3d 258, 270–75 (6th Cir. 2009) (policy prohibiting Uniform Commercial Code materials for legal use in prisons). Nor does the deference afforded to prison officials

supersede this Court's responsibility to draw factual inferences in favor of the nonmoving party at the summary judgment stage. *See Hammer v. Ashcroft*, 512 F.3d 961, 969 (7th Cir. 2008) (reversing summary judgment in part because deference to defendant prison administrators did not counteract factual inferences in plaintiff's favor).

The district court in this case heeded none of these requirements. Instead, the court misconstrued the breadth of the legal speech ban and afforded near limitless deference to Defendants in assessing the ban's reasonableness, despite genuine disputes as to the meaning and function of the policy "on paper and in practice." *Griffin*, 56 F.4th at 338.

## A. Offense C20's Text Prohibits Nearly All Legal Speech, as Confirmed by its Application to Plaintiff and Other Incarcerated Individuals.

The district court's first error was to narrowly interpret Offense C20 to exclude "discussing legal matters in a broad sense." JA763. Defendants themselves never disclaim that Offense C20 bans vast swaths of legal speech and instead defend the ban's prohibition on seeking "legal assistance," "discussing legal matters with other inmates," and "exchanging non-disruptive legal speech." JA73; District Dkt. 83 at 4–5. The court ignored those admissions, failing to recognize that Offense C20 bars *all* speech that relays useful information on legal matters between incarcerated individuals.

This reading of Offense C20 is evident from the policy's plain text, which is the primary indicium of its scope. *See Lumumba*, 116 F.4th at 280. Offense C20 forbids "[a]ssist[ing] another person with litigation or legal matters." JA118. The plain meaning of the verb "assist" is to "give usually supplementary support or aid to." *Assist*, Merriam-Webster Collegiate Dictionary (11th ed. 2003); *see also Assist*, Black's Law Dictionary (6th ed. 1990) (defining "assist" as "to help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary"). Further, because "no clause, sentence, or word shall be superfluous, void, or insignificant" when interpreting the text of a policy, *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879), the term "legal matters" must go beyond mere litigation to include all matters of a legal nature. *See Lumumba*, 116 F.4th at 280 (employing traditional statutory interpretation tools in construing a prison policy). Thus, the plain meaning of assisting another with legal matters encompasses providing encouragement regarding, offering opinions on, or participating in the discussion of any legal topic. As such, Offense C20 forbids incarcerated individuals from sharing legal difficulties encountered on appeal, discussing recent legal developments, offering guidance on navigating the digital tablet technology for legal research, providing generic information about the prison's grievance system, discussing legal strategies generally, or even offering declarations for this litigation.

NCDAC's enforcement of Offense C20 confirms its breadth. *See City of Houston v. Hill*, 482 U.S. 451, 458 n.6 (1987) ("In concluding that the ordinance was overbroad, the Court of Appeals did not err in reviewing evidence . . . concerning the application of the ordinance . . . ."). Plaintiff's uncontroverted declaration reveals that on four separate occasions, prison officials confiscated his legal papers and required him to perform 90 hours of "extra duty" work for merely discussing legal matters with others. JA390. Uncontested evidence provided by Plaintiff's incarcerated peers also demonstrates that the policy is routinely applied by corrections officers to threaten and punish those engaging in *any* discussions of a legal nature, including "simply sharing legal information." JA412; *see also* JA388–389, JA395–399, JA401, JA403, JA405–406, JA409, JA414, JA417–418. These declarations indicate that the broad enforcement of the legal speech ban is not the practice of a few rogue corrections officers, as suggested by the district court, JA763, but rather is a matter of course across NCDAC facilities—so much so as to induce self-censorship. *See* JA412 ("When staff catch legal matters being discussed[,] they stop it promptly . . . [and] they always retaliate [against speaker]. . . ."); *see also Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (finding support that contested prison policy was applied system-wide from "common contentions" provided by plaintiffs in record).

Because the district court asserted that Offense C20 is narrow in scope without analyzing its text or according proper weight to the ample evidence supporting its overbroad application, summary judgment was improper. At minimum, the meaning of the policy "on paper and in practice" is a disputed material fact that must be determined by a factfinder. *Griffin,* 56 F.4th at 338.

## B.  <u>The Legal Speech Ban Is Not Justified by Defendants' Purported Penological Interests Under *Turner*.</u>

The district court also erred in applying the *Turner* factors to the C20 policy, giving unjustified deference to Defendants' assertions that banning vast swaths of legal speech is reasonably related to legitimate penological interests. Rather, all four of the *Turner* factors weigh against the constitutionality of Defendants' legal speech ban both as applied to Mr. LaKemper and on its face. Thus, the C20 policy's non-neutral restrictions of legal speech are an impermissible and "exaggerated response to [Defendants'] . . . security concerns." *Turner*, 482 U.S. at 91.

### 1. *Neither common sense nor record evidence establish a rational connection between the legal speech ban and Defendants' penological interests.*

Defendants proffer three penological interests to justify the legal speech ban: prohibiting the unauthorized practice of law, prohibiting the illicit transfer of information, and prohibiting "extortion, bartering, or gang activity." JA350. Although these are legitimate aims, *Turner* demands there be a "valid, rational connection" between the means employed and the ends asserted. 482 U.S. at 89.

"When *neither common sense nor evidence* demonstrates a reasonable causal nexus between a prison administrator's ends and chosen means, summary judgment for the defendant administrator is inappropriate." *Haze*, 961 F.3d at 659 (emphasis added) (internal citation omitted).

Courts are especially skeptical of prison policies that discriminate on the basis of content. *See Turner*, 482 U.S. at 90 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."). Restrictions that lack "*Turner* neutrality" are thus constitutionally suspect. *Jones v. Slade*, 23 F.4th 1124, 1135–36 (9th Cir. 2022). To be sure, the First Amendment does not require prison policies to be content-neutral in the same way that laws outside the carceral setting must be. *See id.* at 1136 ("*Turner* neutrality is not the 'content neutrality' we demand in other areas of First Amendment jurisprudence."). But under *Turner*, prison administrators may only make content-based distinctions in their policies "on the basis of their potential implications for prison security." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (requiring "[a] substantial governmental interest unrelated to the suppression of expression" to satisfy *Turner* (internal quotation marks and citation omitted)); *Slade*, 23 F.4th at 1137 (reversing summary judgment because application of prison policy censoring rap music but permitting other explicit media

was non-neutral under *Turner*). Content-based distinctions unrelated to security concerns cannot pass constitutional muster.

"[N]either common sense nor evidence" support Defendants' assertion that Offense C20 as written and applied is reasonably related to their proffered penological concerns. *Haze*, 961 F.3d at 659 (internal citation omitted). Defendants worry about the unauthorized practice of law, but their ban on nearly all legal speech "sweeps much more broadly than can be explained by [their] penological objectives." *Turner*, 482 U.S. at 98. There is no reasonable relationship between the specific conduct of unauthorized practice and the far broader ban on nearly all speech on legal matters, including non-disruptive speech. *See Haze*, 961 F.3d at 659 (recognizing reasonable connection between incarcerated plaintiff's prior receipt of contraband and prison administrators opening his legal mail but finding no connection to opening legal mail outside his presence). That is especially so because NCDAC's disciplinary policies already prohibit all violations of state law, addressing Defendants' concern about unauthorized practice without restricting legal speech that does not entail the practice of law. JA116 (B09). Defendants do not claim that Mr. LaKemper was engaging in the unauthorized practice of law when he was disciplined and there is no record evidence that prison officials have ever discovered the unauthorized practice of law when enforcing the C20 policy. *See* JA349–350, JA501–502. Therefore, the legal speech ban is an unconstitutional

"exaggerated response" to Defendants' concerns regarding unauthorized practice. *Turner*, 482 U.S. at 87.

Nor does singling out legal speech for punishment reasonably relate to Defendants' other security concerns. Defendants worry about the transfer of illicit information and "extortion, bartering, or gang activity," JA350, but they offer no reason why speech about legal matters poses a unique danger to those concerns compared to other permitted forms of speech. *See Slade*, 23 F.4th at 1137 (identifying no security justification from Defendants for singling out rap music for prohibition). Indeed, common sense dictates that incarcerated individuals can transfer illicit information in everyday non-legal conversations just as easily as in legal ones; assistance with almost *any* matters, such as reading and writing, can be bartered or extorted; and more inflammatory rhetoric such as discussion of political texts pose greater security risks than non-disruptive legal speech, but are nonetheless permitted by corrections officers. NCDAC's isolation of legal speech for punishment and its toleration of speech that could be equally or more disruptive reveals a desire to suppress expression rather than further a legitimate security rationale. *See Turner*, 482 U.S. at 98 (rejecting Defendants' concern that allowing marriages in prison would lead to "love triangles" and violent confrontations because "inmate rivalries are as likely to develop without a formal marriage ceremony as with one"); *Slade*, 23 F.4th at 1137 (prison's discriminatory application

of a prohibition on explicit material against certain genres of music but not others undercut its security rational, failing *Turner* neutrality standard).

The irrationality of Defendants' justification is once more underscored by record evidence that NCDAC disciplinary policies already prohibit possession or exchange of illicit materials or contraband, be it through bartering, extortion, or other means. JA143 (A07, A15, A16, A21); JA144 (A24); JA145 (B19, C08, C09); JA146 (C14, C15, C17, C21); JA172. Defendants again offer no evidence that that the ban has ever resulted in the discovery of illicit transfers, bartering, extortion, or gang activity. *See* JA349–350, JA501–502. Because the legal speech ban constitutes a non-neutral and "exaggerated response" to Defendants' penological interests, summary judgment was improper. *Turner*, 482 U.S. at 87.

### 2. Plaintiff and his peers have no adequate alternative to exercise their First Amendment right to communicate with other incarcerated individuals about legal matters.

The legal speech ban also leaves Mr. LaKemper and his peers with no alternatives to exercise their right to communicate about legal matters with other incarcerated people. The second *Turner* prong asks whether Plaintiff has "alternative means of exercising the right" at issue. 482 U.S. at 90. This second prong, like the third and fourth prongs, is "historically viewed . . . as being fact-intensive . . . [and] requir[ing] a contextual, record-sensitive analysis." *Wolf v. Ashcroft*, 297 F.3d 305, 310 (3d Cir. 2002) (internal quotation marks and citation omitted). Prison

administrators cannot satisfy this requirement by merely pointing to the existence of alternatives in the formal sense; such alternatives must actually allow for the effective exercise of the right at issue. *See Heyer I*, 849 F.3d at 216 (holding Defendants failed to meet *Turner*'s second prong in defending ban on videophone communications because evidence indicated "no other *effective* means of communication [were] available to [plaintiff]").

Nor is it proper to adopt an overbroad construction of the right at issue to more easily identify alternative means of exercise. In *Thornburgh*, the Supreme Court stated that when assessing the availability of alternatives, "'the right' in question must be viewed sensibly and expansively." 490 U.S. at 417. This Court and sister circuits have emphasized the word "sensibly" in *Thornburgh*'s instructions, holding that it requires "a contextualized inquiry" analyzing the plaintiff's specific claim. *Heyer v. U.S. Bureau of Prisons* (*Heyer II*), 984 F.3d 347, 358 (4th Cir. 2021) (collecting out-of-circuit cases). In *Heyer II*, this Court concluded that a deaf plaintiff's challenge to a prison prohibition on videophone calls specifically implicated his right "to communicate with the Deaf community," as opposed to the more general right to communicate with anyone outside of prison. *Id.*; *see also Hum. Rts. Def. Ctr. v. Ishee*, 726 F. Supp. 3d 482, 497 (E.D.N.C. 2024) (Flanagan, J.) (defining operative First Amendment right in challenge to policy withholding

publications as "[publisher's] and its subscribers' rights to communicate with each other").

Here, under a properly "contextualized inquiry," the right Mr. LaKemper and his peers are barred from exercising is the ability to communicate about legal matters *with other incarcerated people*. *Heyer II*, 984 F.3d at 358. Incarcerated individuals share common questions and possess specific knowledge regarding legal matters related to carceral conditions and experiences with the criminal legal system that external contacts are not poised to discuss. *Cf. id.* at 358–59 (acknowledging common experiences among the Deaf community when determining the scope of the asserted right). For example, Mr. LaKemper has expressed difficulty navigating the new and unfamiliar digital tablet technology to conduct legal research, JA388–389, which external contacts would be unable to assist with. Nor are external contacts able to share pertinent legal information in an emergency. *Cf. Heyer I*, 849 F.3d at 216 ("[T]he availability of in-person visitation [as an alternative exercise of First Amendment rights] is of little help in . . . situations where there is a need for immediate contact."). Because NCDAC's legal speech ban penalizes the relaying of valuable legal information to others in prison, Plaintiff and his incarcerated peers have no alternative means to exercise their First Amendment right to communicate with one another. *Cf. Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) ("[P]risoners

have certain constitutional rights . . . [which] would be diluted if inmates . . . were unable to articulate their complaints to the courts.").

The district court entirely misconstrued the right at issue when it concluded, without evidentiary support, that Plaintiff could discuss legal matters with "family, friends, and other third parties outside the prison." JA765. As explained, external communications do not substitute for the right to discuss legal matters with other incarcerated individuals.

But even assuming these contacts could serve as a substitute for the right at issue, the district court's conclusion was still erroneous because it refused to construe the factual evidence about this alternative in Plaintiff's favor, as is required at the summary judgment stage. *See Moss*, 19 F.4th at 617, 621. In *Heyer I*, this Court reversed summary judgment in a deaf plaintiff's challenge to a prison policy forbidding him from making videophone calls to individuals outside the prison. 849 F.3d at 205. Although the plaintiff had access to text communications and in-person visits, this Court held that those options were inadequate because plaintiff's limited English proficiency rendered written communications inaccessible, and limited availability rendered in-person visits insufficient. *Id.* Analogous circumstances are present here.

Mr. LaKemper has had virtually no success communicating with third parties about legal matters. NCPLS has refused each of his requests for assistance due to

limited capacity and record evidence suggests they categorically cannot help with conditions of confinement claims. JA388, JA440. This reality negates Defendants' contention that NCPLS constitutes a reasonable alternative to legal assistance. JA74. NCDAC has also obstructed Mr. LaKemper's legal communications via mail and retaliated against him when he has attempted to solicit external help. *See infra* at 36, 44. Nor does Mr. LaKemper have family or friends to contact who are interested or versed in relevant legal matters. App. Dkt. 7 at 8. *See Bryan v. Werner*, 516 F.2d 233, 236 (3d Cir. 1975) (stating that "absent *reasonable* alternatives . . . inmates must be allowed to assist other[s] in [legal matters]." (emphasis added)). At minimum, this evidence demonstrates a genuine issue of fact regarding whether effective alternatives exist for the asserted right.

### 3. Permitting legal speech would not burden prison administrators.

Accommodating Mr. LaKemper's and his peers' legal speech rights would not overburden prison administrators and could be accomplished at "*de minimis* cost." *Turner*, 482 U.S. at 91. Where other prison rules exist that already prohibit the conduct prison administrators are concerned about, enjoining the challenged policy would have "little practical effect on [d]efendants." *Caruso*, 569 F.3d at 272. Because that is the case here, Defendants' assertion that enjoining the legal speech ban would increase illicit activity and result in excessive resource expenditure is untenable.

First, as explained, *supra* at 30, NCDAC policy already makes it an offense to participate in the illicit conduct concerning Defendants, adequately addressing their penological interests. Enjoining the policy would have "little practical effect" on Defendants and may even conserve resources by allowing prison officials to dedicate more time to maintaining security as opposed to expending energy identifying and punishing non-threatening legal speech. *Caruso*, 569 F.3d at 272.

Second, the district court erred in assuming, without evidentiary support, that prohibiting only illicit conduct but permitting generalized, non-disruptive legal speech would overly burden prison officials with distinguishing between the two. JA765–766. NCDAC's disciplinary policies indicates that prison administrators routinely make similar distinctions. For example, policy already directs officers to distinguish between prohibited speech that "willfully create[s] . . . [an] offensive condition . . . for personal gain or solicitation," and permissible speech that does not further personal gain or solicitation. JA117 (C13). This calls into question the district court's unsubstantiated conclusion that prison administrators would be overly burdened if the legal speech ban were enjoined, creating a dispute of material fact requiring reversal of summary judgment.

### 4. *Alternative regulations furthering Defendants' penological aims already exist.*

The district court erred in assessing the fourth *Turner* factor—which turns on whether there is an "obvious, easy alternative" to the challenged policy—for largely

the same reasons as the third. 482 U.S. at 90. There are multiple alternatives to the legal speech ban that would uphold Defendants' penological interests at *de minimis* expense without suppressing non-disruptive legal speech. *Id.* at 91.

As explained, *supra* at 30, existing NCDAC policies already prohibit the conduct underlying Defendants' penological interests without prohibiting unoffensive legal speech. No other state in the Fourth Circuit has found it necessary to prohibit general legal discussions for prison security purposes, as Virginia's correctional policy prohibits only "[c]harging or accepting any compensation for legal assistance or for other services." *See supra* at 6. These examples present "obvious, easy alternative[s]" for how Defendants' policy could be amended to simultaneously serve penological interests and preserve constitutional protections for incarcerated individuals. *Turner*, 482 U.S. at 90.

In sum, the district court uncritically deferred to Defendants at every stage of the *Turner* inquiry, ignoring material disputes of fact concerning both the scope of NCDAC's C20 policy as well as evidence indicating that the policy lacks a reasonable relationship to Defendants' penological interests. Its grant of summary judgment for Defendants was thus improper and should be reversed.

## II. THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S MAIL INTERFERENCE CLAIM.

Just as individuals retain their First Amendment right to communicate about legal matters while incarcerated, they too retain their First Amendment right to send

and receive mail in prison. *See Thornburgh*, 490 U.S. at 407. That includes the right to receive "materials of a legal nature, which have impact upon [incarcerated persons'] legal rights and/or matters . . . ." *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). Defendant Ishee, who delegated final decision-making authority over an exclusive duty of the state to process incoming mail to the contractor TextBehind, is liable for the constitutional violations resulting from the contractor's practices. Record evidence establishes a genuine factual dispute such that a factfinder could find that TextBehind maintains a practice of rejecting mail containing legal materials in violation of its own and NCDAC's policies. And under a straightforward application of *Turner*, this practice violated Mr. LaKemper's First Amendment rights. The district court misapplied the law of government liability for contractors and never assessed the legality of Defendants' mail interference practices under *Turner*. Summary judgment was improper and should be reversed.

## A. Defendant Ishee Is Liable for TextBehind's Conduct.

The district court granted summary judgment because it erroneously concluded that Mr. LaKemper did not "offer evidence showing that defendants were responsible for any delays or non-receipt of his mail" processed by TextBehind. JA767. This conclusion misunderstands government liability under section 1983.

As a general matter, contracting with private entities to fulfill a state's constitutional duties does not immunize the government from liability for

constitutional deprivations that result. *See West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 341 (4th Cir. 2000) (suggesting the government cannot "avoid constitutional limits and obligations by simply delegating core governmental functions to private actors"); *Scott v. Clarke*, 64 F. Supp. 3d 813, 820 (W.D. Va. 2014) (stating that governments which contract with a private entity "to perform an obligation owed . . . remain[] liable for any constitutional deprivations caused by the policies or customs" of the contractor (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 n.9 (11th Cir. 1985))). Defendant Ishee may not shirk liability for interference with Mr. LaKemper's mail simply by pointing to TextBehind's role in the matter. Otherwise, officials could launder all types of constitutional violations through private contractors.

There are several circumstances where "[a] state . . . will be held responsible for a private actor's decision." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 115 (4th Cir. 2022). First, state actors face direct section 1983 liability for the unconstitutional actions of their contractors when they allow contractors to "exercise[] powers that are traditionally the exclusive prerogative of the state."

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 456 F. Supp. 3d 699, 707–08 (D. Md. 2020), *rev'd and remanded on other grounds*, 2 F.4th 330 (4th Cir. 2021) (quoting *Conner v. Donnelly*, 42 F.3d 220, 224 (4th Cir. 1994)). In *Leaders*, the Baltimore Police Department ("BPD") contracted a private company to manage an aerial surveillance program of the city, which plaintiffs challenged on First and Fourth Amendment grounds. 456 F. Supp. 3d at 702. The court found that the contractor's actions were "attributable to [BPD] for purposes of assessing the Plaintiffs' § 1983 claims" because under the contract, the contractor would be "exercising powers which are traditionally within the exclusive domain of [] BPD." *Id.* at 707.

Likewise, in Eighth Amendment lawsuits challenging the provision of medical care to incarcerated individuals, prisons and their administrators have been held liable for the practices of contractors that resulted in deficient medical care. *See generally Scott*, 64 F. Supp. 3d 813; *see also Barkes v. First Corr. Med. Inc.*, 766 F.3d 307, 332 (3d Cir. 2014) (reasoning § 1983 liability could apply to prison administrators who failed to supervise contracted health care providers who violated health guidelines), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015); *Burke v. Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019) (affirming liability for sheriff's unconstitutional practices that permitted substandard jail medical care by third-party contractors). Provision of medical care to incarcerated individuals is

the state's constitutional duty and exclusive prerogative because incarcerated people have no alternative means of acquiring medical care other than what is provided by the state. *Conner*, 42 F.3d at 224.

Second, "where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy." *Ancata*, 769 F.2d at 705 n.9; *see also King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (holding a county could not "shield itself from § 1983 liability by contracting out its duty to provide medical services."). "The underlying rationale is not based on *respondent superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *King*, 680 F.3d at 1020.

Here, Defendant Ishee is liable for TextBehind's mail processing practices under both theories. NCDAC began using TextBehind to process incoming mail to incarcerated individuals in October 2021, pursuant to the "New Offender Mail Policy" issued by Defendant Ishee delegating mail processing to TextBehind. JA448, JA96–104. Just as conducting surveillance of a city or providing medical care in prison is traditionally within the exclusive domain of a state, processing mail in prison is as well. *See, e.g.*, *Thornburgh*, 490 U.S. at 403 (regulations authorized prison officials to reject mailed publications detrimental to institutional security); *Altizer v. Deeds*, 191 F.3d 540, 548–49 (4th Cir. 1999) (policy permitted prison

officials to open and inspect outgoing mail). Incarcerated individuals have no alternative means for exercising their First Amendment right to send and receive mail other than through the systems approved and operated by prison staff. As a result, TextBehind's policies and decisions "effectively bec[ame] and constitute[d]" Ishee's policies and decisions. *Scott*, 64 F. Supp. 3d at 821. Moreover, TextBehind was the final decision-maker in choosing to reject mail that it processed. JA390, JA392, JA448. Thus, constitutional violations that occur as a consequence of TextBehind's actions can be attributed to Defendant Ishee. The district court erred in stating otherwise and improperly granting summary judgment to Defendant Ishee on this basis.

## B. **There Exists a Genuine Issue of Material Fact as to Whether TextBehind Maintains an Unconstitutional Custom of Rejecting Non-Privileged Legal Material.**

When there is a material dispute regarding the meaning and function of a prison policy "on paper and in practice," summary judgment is improper. *Griffin*, 56 F.4th at 338. The district court overlooked uncontested record evidence of TextBehind's interference with non-privileged legal materials sent to incarcerated individuals, creating a genuine dispute about how the mail policy functions.

"'[N]umerous particular instances' of unconstitutional conduct" establish a custom or practice for section 1983 purposes. *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003) (quoting *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991)); *see also*

*Holmes v. Godinez*, 311 F.R.D. 177, 217–18 (N.D. Ill. 2015) (crediting testimony of nine plaintiffs about unlawful practices as "significant proof" of system-wide practices). Unreasonable mail delays and failure or refusal to deliver incoming mail constitute First Amendment violations so long as they surpass a mere "occasional, negligent delay." *Jones v. Hamilton*, Case No. 7:23CV00016, 2024 WL 1959289 at *3 (W.D. Va. May 2, 2024); *see also Bolding v. Holshouser*, 575 F.2d 461, 465, 468 (4th Cir. 1978) (finding allegations of unreasonable delays and failures to deliver mail to be cognizable First Amendment claims).

Viewing the record evidence in the light most favorable to Mr. LaKemper, there is a genuine issue of fact as to whether TextBehind maintains a practice of rejecting non-privileged legal material. Although TextBehind's policies allow for the processing of non-privileged mail containing legal material, record evidence of Mr. LaKemper's experience and that of his peers shows that its practices do not align with its stated policies. Between January 2022 and January 2024, Mr. LaKemper's non-privileged legal material was summarily rejected and returned to sender because of their legal nature on five occasions. JA377, JA392. That included a copy of documentary material necessary for attachment to an Industrial Commission Proceeding sent by EPS and thirty-nine pages of legal research sent by a friend, neither of which meet TextBehind's definition of "privileged mail." JA42.

Mr. LaKemper is not the only one who has been deprived of non-privileged mail legal in nature subsequent to the mail policy change. Eight other incarcerated individuals, on eleven separate occasions, have had their non-privileged legal materials withheld by TextBehind, including case law, documentary material, exhibits, affidavits, motions, and a prison litigation manual. JA395–418. Notably, Defendants do not contest this evidence. JA395–406, JA409–415, JA417–418.

Viewed in the light most favorable to Plaintiff, the experiences attested to in the above declarations and affidavits raise a genuine issue of material fact as to TextBehind's actual practices, despite its contractual obligation to process and send all non-privileged mail to facilities without regard to content. Thus, a factfinder could find that TextBehind maintains a custom of rejecting non-privileged mail containing legal papers, is attributable to Defendant Ishee.

Because TextBehind's practice of rejecting non-privileged legal materials is attributable to Defendant Ishee, the practice must satisfy the Constitution's requirements. Restrictions on incarcerated individuals' rights to receive mail, like other rights in prison, must satisfy the four-factor test from *Turner*, 482 U.S. at 89–90. Here, Defendants provide no penological justification—let alone a legitimate one—for the rejection of non-privileged mail containing legal material. The practice ostensibly violates both TextBehind and NCDAC policy, rendering it arbitrary and unconnected to any "legitimate penological interest[]." *Id.* at 89; *see also Hum. Rts.*

*Def. Ctr.*, 726 F. Supp. 3d at 496 (Flanagan, J.) (holding that a practice that violates a prison's own policies "undermines any suggestion [that it was a] necessary or even desirable means of furthering defendants' interests in institutional security and order."). Furthermore, there are no alternative means for incarcerated individuals to exercise this right, as many are indigent and cannot afford to hire attorneys to send them legal materials through privileged mail channels. *See, e.g.*, JA403, JA405, JA417. Finally, there is a simple and un-burdensome alternative to the practice: directing TextBehind to allow such mail to be processed.

Because the district court misapplied the law of government liability under section 1983, and because there exists a genuine issue of material fact, the grant of summary judgment as to this claim was improper and should be reversed.

## III.   THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.

The district court erred when it granted summary judgment to Defendant Owens, as it resolved disputed issues of material fact in favor of the moving party. To litigate separate lawsuits against NCDAC, Mr. LaKemper asked to send his own funds to an outside paralegal service for legal research and copies of legal material. But in retaliation for Mr. LaKemper's exercise of his right to access the courts, Defendant Owens denied Mr. LaKemper's perfectly legitimate request, then offered post-hoc and shifting justifications to rationalize his actions. The district court erred in drawing factual inferences for the moving party as to whether Owens's denial

constituted an "adverse action," and in crediting Owens's post-hoc justifications despite substantial evidence that they were pretextual.

"To state a colorable First Amendment retaliation claim, a plaintiff 'must allege that (1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct.'" *Martin II*, 977 F.3d at 299 (quoting *Martin v. Duffy* (*Martin I*), 858 F.3d 239, 249 (4th Cir. 2017)). If the plaintiff makes this showing, the defendant can defeat the inference of a retaliatory motive "by proving [they] 'would have reached the same decision . . . in the absence of the protected conduct.'" *Id.* If the defendant does so, the burden then shifts back to the plaintiff, who can defeat summary judgment by offering sufficient evidence from which a reasonable factfinder could conclude that the defendant's proffered reasons were pretextual. *Savoy v. Bishop*, 706 F. App'x 786, 790 (4th Cir. 2017) (citing *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). Here, each factor favors Plaintiff and the district court improperly granted summary judgment to Defendants.

### A. **Plaintiff's Lawsuits Were Protected First Amendment Activity.**

The district court "assum[ed] Plaintiff engaged in protected First Amendment activity by filing the lawsuits noted in the [special draw] request." JA769. That

conclusion should not be disturbed. This Court has "long held that prison officials may not retaliate against prisoners for exercising their right to access the courts, which is a component of the right to petition for redress of grievances." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (citations omitted). Mr. LaKemper was thus engaged in protected First Amendment activity in attempting to litigate against NCDAC.

## B. The District Court Misconstrued the Relevant Legal Standard and Improperly Drew Inferences in Defendant Owens's Favor When It Concluded that Plaintiff Did Not Suffer an Adverse Action.

The "adverse action" standard does not require a plaintiff to show that the defendant's conduct "independently deprive[d] [him] of a constitutional right." *ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993). Rather, a plaintiff must show only that he "suffered . . . more than a *de minimis* inconvenience," *id.*, and that "the defendant's allegedly retaliatory conduct would likely deter a 'person of ordinary firmness' from the exercise of First Amendment rights." *Martin I,* 858 F.3d at 249 (quoting *Constantine v. Rectors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). "[T]his threshold is intended to weed out only inconsequential actions and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999).

Moreover, the "adverse action" determination "is an 'objective standard'; thus, 'while the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.'" *Jones v. Solomon*, 90 F.4th 198, 214 (4th Cir. 2024) (quoting *Constantine*, 411 F.3d at 500). It is not "necessary that the prisoner succumb entirely or even partially" to the defendant's retaliatory action. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). Despite the objective nature of this standard, it is still a "fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (citing *Thaddeus-X*, 175 F.3d at 398). The "adverse action" inquiry considers the context in which the conduct occurred, including facts that would indicate to someone in the plaintiff's position that the defendant's action was "intended to be punitive." *Solomon*, 90 F.4th at 215.

Here, a factfinder could find that Defendant Owens's denial of Plaintiff's special draw request to purchase general legal services for his ongoing litigation against NCDAC constituted an "adverse action." In fact, the district court came to the same conclusion earlier in the litigation before changing its mind. *Compare* JA55 *with* JA769. It is well established that "the government may not deny a benefit to a person on a basis that infringes his [First Amendment rights], even if he has no

entitlement to that benefit." *Board of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up). This Court has held several times that an "adverse action" may consist of the denial or withdrawal of certain discretionary benefits and procedures by a government actor. *See Constantine*, 411 F.3d at 500–01 (denying student her request to sit for re-examination); *Suarez*, 202 F.3d at 686–87 (terminating public benefits). Furthermore, here, the denial actively curtailed the ongoing exercise of Plaintiff's First Amendment right, as he was unable to obtain the legal research and photocopies from EPS that he needed to litigate several separate lawsuits. JA393–394. Anticipating Defendant's approval, Plaintiff had already mailed the time-sensitive documents he needed copied to EPS; EPS returned the materials when it realized Plaintiff had not sent the funds, and Plaintiff ultimately suffered the wasted postage costs. District Dkt. 78 at 20 n.17; *see also* JA690–691 (mailroom logs for uncopied documents returned to Plaintiff from EPS). Because Defendant also declined Plaintiff's request for copying assistance, JA490, he continued to struggle to obtain the needed documents. JA393–394. Without EPS's paralegal services, Plaintiff was unable to effectively present his Industrial Commission negligence claim, which was dismissed later that year. JA393–394, JA770.

Additional circumstances surrounding the special draw denial would have indicated to someone in Plaintiff's position that it was "intended to be punitive." *Solomon*, 90 F.4th at 215. Mr. LaKemper's request clearly stated that he was seeking

paralegal services for his litigation against NCDAC. JA483. Mr. LaKemper was not informed that his request had been denied until nearly two weeks after the disapproval. JA483, JA487. Mr. LaKemper was initially told that Owens had denied his request because of a prohibition on drawing funds for "future use," but no section of the Special Draw SOP was ever cited to support the existence of such a prohibition. JA393, JA487. Per evidence in the record, Owens had never denied a special draw request before. JA393. When discussing the denial, Owens's administrative assistant told Plaintiff that he would be "stupid to think" his request would be approved with a stated purpose of advancing his lawsuit against NCDAC. JA393. Moreover, the relative positions of Defendant, PCI Warden, and Plaintiff, an incarcerated individual in his charge, create a "significant power imbalance." *Williams v. Mitchell*, 122 F.4th 85, 90 (4th Cir. 2024). Against this backdrop, a factfinder could find that Defendant's denial would have signaled that prison staff were willing and able to suppress the exercise of Plaintiff's rights.

The district court's conclusion otherwise ignored these facts and disregarded established precedent in multiple ways. First, the court implied that the "adverse action" element would be satisfied only if Mr. LaKemper could show that Owens's conduct had "caused prejudice" in an ongoing case. JA770. Although Plaintiff would need to demonstrate this kind of injury to show a stand-alone violation of his right to access the courts, *see Lewis v. Casey*, 518 U.S. 343, 351 (1996), the "adverse

action" standard for retaliation imposes no such burden. *See Wicomico*, 999 F.2d at 786 n.6 ("Such a rule would make a cause of action for retaliation wholly redundant of the protections provided by the Constitution itself."). Plaintiff was not required to show that the denial amounted to a unique constitutional wrong, and the district court improperly faulted him for failing to do so.

Second, the district court improperly suggested that only a limited range of conduct qualifies as an adverse action, such as "disciplinary action," demotion in custody status, placement in segregation, or "transfer[] to a less desirable prison." JA769. However, given this Court's emphasis on the "fact intensive" nature of the standard, *Suarez*, 202 F.3d at 686, an adverse action does not have to fit within these categories. Plaintiff needed only to establish that a person of ordinary firmness would have been deterred from exercising their rights as a result of Defendant's action. *See Solomon*, 90 F.4th at 214.

Third, the district court erred by treating Plaintiff's subjective reaction to the denial as dispositive. The court faulted Plaintiff for "not even attempt[ing] to resubmit the request with an order form or other documentation," holding that "[i]n the absence of evidence showing that [D]efendant Owens would have denied a request that complied with policy, no reasonable juror could find" that Plaintiff had alleged an adverse action. JA769 (citing JA488). The court's treatment of Mr. LaKemper's personal reaction misunderstands the objective nature of the inquiry.

*See Solomon*, 90 F.4th at 215 (holding that defendant's decision to continue pursuing grievances "[a]t most . . . create[d] a genuine dispute of fact" as to adverse action). In any event, Plaintiff's decision not to re-submit the special draw request actually cuts in his favor, because it shows that Owens's denial of the request discouraged him from exercising his First Amendment rights.

In sum, the district court erred by misconstruing the relevant legal standard and by drawing inferences in Defendant Owens's favor in determining whether the denial constituted an "adverse action." As a reasonable factfinder could conclude that Owens's denial of funds to pay EPS constituted an adverse action, the district court should not have granted the Defendant's motion for summary judgment.

### C. **Disputed Issues of Fact Exist as to Whether Defendant's Proffered Rationale for Denying the Special Draw Request Was Pretextual.**

The district court also erred when it ignored the mountain of evidence indicating that Owens's rationale was pretextual. It is well-recognized that "shifting and inconsistent justifications" are "probative of pretext." *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) (cleaned up); *see also Martin II*, 977 F.3d at 305 (summary judgment improper because inconsistencies in defendant's affidavit created triable issue of pretext); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253–54 (4th Cir. 2015) (summary judgment improper because defendants' conflicting statements about plaintiff's work quality and failure to "initially provide [plaintiff] with a reason for her termination" created triable issue regarding pretext).

A defendant's justification is also considered pretextual if proffered only after the "adverse action" has taken place or the plaintiff has sought redress. *See Smith*, 12 F.4th at 421 ("[A] factfinder may infer that an employer's post-hoc rationale is not a legitimate explanation for an adverse employment decision.").

Here, assuming Plaintiff made out a prima facie case for retaliation, the district court found that Defendant Owens had rebutted that case by offering "uncontradicted evidence that he would have made the same decision even absent the knowledge of the lawsuit"—Owens stated that "inmates requesting payment to [EPS] must provide a bill, statement, or order form" and Mr. LaKemper did not provide the acceptable documentation. JA771. However, the record is replete with evidence to the contrary. Defendant Owens offered both shifting and post-hoc justifications for his retaliatory action, suggesting that his proffered "acceptable documentation" rationale was pretextual.

As for shifting justifications, since Defendant first denied Plaintiff's special draw request, Owens and his intermediaries have provided a total of *eleven* unique justifications, listed by communication as follows:

- April 28, 2021: Plaintiff receives word from Riggs and a rejection letter from Freeman stating that Defendant Owens denied the request based on (**#1**) policy prohibiting sending money for "future use." JA487.

- May 4, 2021: "Step One" grievance response from Brenda Nixon states that Defendant denied request based on (**#2**) requirement of "proper documentation," such as "bill, invoice, or statement," and (**#3**) prohibition on incurring debt. JA250.

- May 7, 2021: Defendant responds to Plaintiff's grievance, citing prohibition on incurring debt, failure to provide "statement or invoice," and (**#4**) the fact that EPS is not a "local financial institution." JA488.

- May 18. 2021: "Step Two" grievance response from Wooten endorses "Step One" response and adds (**#5**) that "research of [EPS] . . . discovered they are not a legal office, but an establishment that provides services." JA652.

- May 5, 2023: Responding to interrogatories, Defendant claims he denied the request due to (**#8**) Mr. LaKemper's "not giving all information" and (**#9**) "not complet[ing] the proper [paperwork] correctly." JA503.

- February 20, 2024: In Defendant's Declaration for this litigation, he stated that he denied the request because (**#10**) he "did not feel [it] fit within one of the specified reasons to issue a special draw," that it was "not accompanied by a bill, invoice, statement, or order form," and that (**#11**) "it did not appear that [Plaintiff] was attempting to pay a debt or procure articles authorized under Department policies." JA360.

Standing alone, these "shifting and inconsistent justifications" are sufficient evidence of pretext to preclude summary judgment. *See Smith*, 12 F.4th at 421. But Plaintiff offered even more facts to rebut Defendant's proffered reliance on the "acceptable documentation" rationale:

- Plaintiff's prominent disclosure of his ongoing litigation against NCDAC on the special draw request form, which Owens reviewed and signed. JA483.

- The temporal proximity (same day) between Plaintiff's submission of that candid request and Owens's denial of that request. JA483.

- The fact that Appellant received no notification of the denial for nearly two weeks and received an explanation only when he inquired about his draw request. JA22, JA483, JA487.

- Unit Manager Riggs's statement to Mr. LaKemper that, to his knowledge, Owens had never denied a special draw request before Appellant's. JA393.

- The comment from Owens's administrative assistant, Sherri Valerio, that Mr. LaKemper would be "stupid to think" that the PCI Trust Fund Office would approve a request intended to aid in Appellant's "lawsuit against [NCDAC]" and that he would have been smarter to lie on the form. JA393.

The district court's opinion disregarded nearly all of these facts. JA771.

Accordingly, in finding that Defendant's proffered rationale was "uncontradicted," JA771, the district court failed both to "view[] the facts in the light most favorable to the nonmoving party" and to "read the pleadings of a pro se plaintiff liberally." *Martin II*, 977 F.3d at 298.

The district court also erred in crediting Defendant's assertion that "inmates requesting payment to [EPS] must provide a bill, statement, or order form for specific services," JA771 (citing JA245), both because the rationale was only offered post hoc and because genuine issues of fact exist as to whether this "acceptable documentation" requirement applied to Plaintiff's special draw request at all.

Before Mr. LaKemper lodged his grievance alleging that Defendant had denied the request for retaliatory reasons, the only explanation offered by Owens, as communicated through subordinates, was that NCDAC policy prohibits drawing

funds for "future use." JA22, JA487. The first time the "acceptable documentation" rationale was given was in response to Mr. LaKemper's grievance for the denied request. JA651. Therefore, the district court's finding that Owens "was acting pursuant to a pre-determined application of the special draw policy" was counterfactual and improper at the summary judgment stage. JA771. This post-hoc rationale was "not a legitimate explanation" for Defendant's conduct. *Smith*, 12 F.4th at 421.

At the very least, a genuine dispute of fact exists as to whether Defendant Owens had "no choice but to deny" Mr. LaKemper's request for lack of proper documentation. JA771; *see also Griffin*, 56 F.4th at 338 (holding that summary judgment is improper where there is genuine dispute about meaning and function of prison policy "on paper and in practice"). Only two subsections of the Special Draw SOP require "proper documentation," such as a "bill, invoice, or statement," and these apply only if money is being sent to an "individual" or to a "church, organization, or any type of group." JA147. EPS is neither an individual nor a "type of group" akin to a church—it is a business providing paralegal services. *Compare* JA74 *with* JA369. Given the uncertainties about the meaning of this policy in practice, summary judgment was improper, and a factfinder should determine whether Owens's proffered justifications were actually pretextual.

# CONCLUSION

For the reasons above, the district court's decision granting summary judgment should be reversed.

# REQUEST FOR ORAL ARGUMENT

Due to the significant and complex legal issues in this case, Plaintiff respectfully requests oral argument pursuant to Local Rule 34(a).

Dated: March 17, 2025                    Respectfully submitted,

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

*Lydia Hill, Emily Luong, and Alessandra Quattrocchi, law student advocates, assisted in the preparation of this brief*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12784 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: March 17, 2025

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I certify that on March 17, 2025, I electronically filed the foregoing Opening Brief and Joint Appendix with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: March 17, 2025

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*