No. 24-6930

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COBEY LAKEMPER,

*Plaintiff – Appellant*,

v.

LESLIE COOLEY DISMUKES, ET AL.,

*Defendants – Appellees*.

On Appeal from
The United States District Court for the Eastern District Of North Carolina
Case No. 5:20-ct-03083-FL

## REPLY BRIEF OF PLAINTIFF-APPELLANT

DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

July 11, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................2

I.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY
     JUDGMENT ON PLAINTIFF'S LEGAL SPEECH BAN CLAIM ....................2

     A.   Offense C20 Bans Vast Swaths of Nondisruptive Legal Speech .............3

     B.   The Speech Ban Is Not Justified by Defendants' Purported Penological
          Interests Under *Turner* ...............................................................5

          1.   The speech ban lacks any rational connection to Defendants' purported
               penological interests...............................................................6

          2.   Plaintiff lacks adequate alternatives to exercising his First Amendment
               right to communicate with other incarcerated individuals about legal
               matters..................................................................................9

          3.   Permitting non-disruptive legal speech would not burden prison
               administrators.......................................................................11

          4.   Alternative regulations furthering Defendants' penological aims already
               exist ....................................................................................13

          5.   There is a dispute of fact as to whether Plaintiff exhausted available
               administrative remedies .........................................................14

          6.   Plaintiff's claim is not time barred ........................................18

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY
     JUDGMENT ON PLAINTIFF'S MAIL INTERFERENCE CLAIM ................19

     A.   Defendant Ishee is Directly Liable for TextBehind's Policies and
          Practices .................................................................................19

     B.   There is an Issue of Material Fact as to Whether TextBehind Maintains
          an Unconstitutional Practice of Rejecting Non-Privileged Legal Material ......21

i

C.      Defendants do not contest that a practice of rejecting non-privileged legal materials is unconstitutional under *Turner* ...............................................23

III.    THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM ...............................23

A.      There is a Dispute of Fact as to Whether Denying Mr. LaKemper's Special Draw Request Constituted an Adverse Action.....................................24

B.      Disputes of Fact Exist as to Whether Defendant Owens's Proffered Rationales for Denying the Special Draw Request Were Pretextual................25

IV.     DEFENDANTS HAVE WAIVED THEIR QUALIFIED IMMUNITY DEFENSE, WHICH FAILS IN ANY EVENT....................................................27

CONCLUSION ...........................................................................................29

CERTIFICATE OF COMPLIANCE ........................................................30

CERTIFICATE OF SERVICE ...................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*ACLU of Md., Inc. v. Wicomico Cnty.*,
   999 F.2d 780 (4th Cir. 1993)............................................................................. 24

*Ancata v. Prison Health Servs., Inc.*,
   769 F.2d 700 (11th Cir. 1985)................................................................... 19, 20

*Booker v. S.C. Dep't of Corr.*,
   855 F.3d 533 (4th Cir. 2017)............................................................................. 28

*Carter v. Fleming*,
   879 F.3d 132 (4th Cir. 2018)............................................................................. 17

*Constantine v. Rectors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005)....................................................................... 24, 25

*Davis v. Goord*,
   320 F.3d 346 (2d Cir. 2003).............................................................................. 23

*Firewalker-Fields v. Lee*,
   58 F.4th 104 (4th Cir. 2023) ............................................................................. 10

*Gowen v. Winfield*,
   130 F.4th 162 (4th Cir. 2025) ........................................................................... 14

*Grayson O Co. v. Agadir Int'l LLC*,
   856 F.3d 307 (4th Cir. 2017)............................................................................. 28

*Grenning v. Klemme*,
   34 F. Supp. 3d 1144 (E.D. Wash. 2014) ........................................................... 23

*Griffin v. Bryant*,
   56 F.4th 328 (4th Cir. 2022) ......................................................................... 4, 14

*Hayes v. Idaho Corr. Ctr.*,
   849 F.3d 1204 (9th Cir. 2017)........................................................................... 23

*Heyer v. United States Bureau of Prisons*,
 (*Heyer I*), 849 F.3d 202 (4th Cir. 2017) ............................................. 10

*Heyer v. United States Bureau of Prisons (Heyer II)*,
 984 F.3d 347 (4th Cir. 2021) ........................................................ 9, 10

*Houston v. Hill*,
 482 U.S. 451 (1987) ......................................................................... 4

*Hudspeth v. Figgins*,
 584 F.2d 1345 (4th Cir. 1978) .......................................................... 25

*Hum. Rts. Def. Ctr. v. Ishee*,
 726 F. Supp. 3d 482 (E.D.N.C. 2024) ............................................... 10

*Jones v. Bock*,
 549 U.S. 199 (2007) .................................................................... 14, 15

*Jones v. Hamilton*,
 2024 WL 1959289 (W.D. Va. May 2, 2024) .................................... 22

*Jones v. Slade*,
 23 F.4th 1124 (9th Cir. 2022) ............................................................ 8

*Jones v. Solomon*,
 90 F.4th 198 (4th Cir. 2024) ........................................................... 25

*Kensu v. Haigh*,
 87 F.3d 172 (6th Cir. 1996) ........................................................ 23, 28

*King v. Kramer*,
 680 F.3d 1013 (7th Cir. 2012) ......................................................... 20

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
 456 F. Supp. 3d 699 (D. Md. 2020) ................................................. 20

*Lumumba v. Kiser*,
 116 F.4th 269 (4th Cir. 2024) ........................................................... 3

*Martin v. Duffy (Martin I)*,
  858 F.3d 239 (4th Cir. 2017)................................................................ 24

*Martin v. Duffy (Martin II)*,
  977 F.3d 294 (4th Cir. 2020)........................................................ 24, 26

*Moore v. Bennette*,
  517 F.3d 717 (4th Cir. 2008).............................................. 14, 15, 16, 17

*Nordstrom v. Ryan*,
  856 F.3d 1265 (9th Cir. 2017).............................................................. 10

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014)................................................................ 4

*Ross v. Blake*,
  578 U.S. 632 (2016) ........................................................................... 15

*Scott v. Clarke*,
  64 F. Supp. 3d 813 (W.D. Va. 2014) ........................................... 20, 21

*Shaw v. Murphy*,
  532 U.S. 223 (2001) ................................................................... 8, 9, 28

*Short v. Hartman*,
  87 F.4th 593 (4th Cir. 2023) ...................................................... 27, 28

*Smith v. CSRA*,
  12 F.4th 396 (4th Cir. 2021) ............................................................. 26

*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000)............................................................. 25

*Thornburgh v. Abbott*,
  490 U.S. 401 (1989) ..................................................................... 7, 28

*Turley v. Rednour*,
  729 F.3d 645 (7th Cir. 2013).............................................................. 15

*Turner v. Safley,*
    482 U.S. 78 (1987) ....................................................................Passim

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ........................................................................ 5

*Ward v. Caulk,*
    650 F.2d 1144 (9th Cir. 1981) ...................................................... 18

*Wilcox v. Brown,*
    877 F.3d 161 (4th Cir. 2017) ................................................... 15, 18

*Williams v. Blue Cross Blue Shield of N.C.,*
    357 N.C. 170 (2003) ...................................................................... 18

*Woodford v. Ngo,*
    548 U.S. 81 (2006) ........................................................................ 14

**Statutes**

42 U.S.C. § 1997e(a) .......................................................................... 14

# INTRODUCTION

Plaintiff Cobey LaKemper asks this Court to let a factfinder resolve factual disputes as to the constitutionality of several North Carolina Department of Adult Corrections ("NCDAC") policies and practices designed to suppress legal speech. He has presented ample evidence that NCDAC (1) enforces an unconstitutionally overbroad policy—unique in the Fourth Circuit—banning nearly all legal speech in prison; (2) interferes with his right to receive mail by licensing a third-party contractor to withhold letters containing legal material; and (3) retaliated against him for suing the State.

Defendants' response mostly fails to engage with Mr. LaKemper's arguments or cited case law. Instead, they cling repeatedly to the principle that deference is owed to prison officials in the administration of prison rules. Although courts must of course afford prison administrators appropriate deference, their review of prison policies and practices is not toothless. Courts may not ignore errors of law or paper over disputes of material fact that a factfinder should resolve. Yet, that is precisely what Defendants ask this Court to do. This Court should decline that request and hold that the district court erred in awarding Defendants summary judgment on all three claims.

**ARGUMENT**

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S LEGAL SPEECH BAN CLAIM

Defendants' response merely repeats the district court's errors. In a change of position, Defendants now defend the district court's erroneous interpretation that Offense C20's ban on "[a]ssist[ing] another person with litigation or legal matters" exempts "discussing general legal topics of interest," a reading that Defendants never advanced below. But this interpretation contravenes both the plain text and application of the policy. Properly read, Offense C20 prohibits providing encouragement regarding, offering opinions on, or participating in the discussion of any legal topic, banning vast swaths of nondisruptive legal speech.

There is no rational connection between this sweeping speech prohibition and Defendants' far narrower interests in preventing the unauthorized practice of law or other illicit conduct. Defendants have no response to the fact that existing NCDAC policies already prohibit the conduct that concerns them such that the only additional activity Offense C20 prohibits is non-disruptive speech. Like the numerous policies the Supreme Court and this Court have found to violate *Turner*, the prison speech ban is unrelated to Defendants' penological interests. Op.Br.22 (collecting cases that courts have found violate *Turner*).

## A. Offense C20 Bans Vast Swaths of Nondisruptive Legal Speech

As an initial matter, the district court misconstrued the legal speech ban's expansive scope. In a change of position, Defendants now attempt to defend that interpretation, Br.8, but they have never previously claimed that the ban exempted general legal topics. Instead, Defendants in the district court endorsed the fact that the policy prohibited all "legal assistance," "discussing legal matters with other inmates," and "exchanging non-disruptive legal speech." Dist. Dkt. 83 at 4-5 (MSJ Reply). This new position runs contrary to both the text and application of the policy. *See Lumumba v. Kiser*, 116 F.4th 269, 280–83 (4th Cir. 2024) (employing traditional statutory interpretation tools in construing prison policy).

Begin with the policy's plain text. Both parties agree that to "assist another person with . . . legal matters" means to give "support or aid" related to those matters. Br.8. And Defendants never contest that the term "legal matters" must be broadly construed to include all matters of a legal nature, lest the term be superfluous. Op.Br.24. It follows that Offense C20 prohibits supporting or aiding another person with any legally related matter. This definition logically covers all manner of nondisruptive legal speech that may or may not involve general legal topics of interest, including sharing legal difficulties encountered on appeal, explaining a recent Supreme Court case to others, offering guidance on the prison grievance

process, discussing legal strategies generally, or even offering declarations for this litigation. All these forms of speech involve supporting someone with a legal matter.

This interpretation is not only hypothetical. Undisputed record evidence reveals that NCDAC officials routinely apply the policy against Plaintiff and other incarcerated individuals to threaten and punish those engaging in any discussions of a legal nature, including "simply sharing legal information." JA412; *see also* JA388–389, JA395–399, JA401, JA403, JA405–406, JA409, JA414, JA417–418. Defendants attempt to disclaim any "personal involvement in interpreting or applying" the policy in this way, Br.9, but that misses the point. They are personally involved in establishing and enforcing NCDAC policy and courts frequently look to how a policy is applied to determine its meaning. *See, e.g.*, *Houston v. Hill*, 482 U.S. 451, 458 n.6 (1987) ("In concluding that the ordinance was overbroad, the Court of Appeals did not err in reviewing evidence . . . concerning the application of the ordinance . . . ."); *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (finding support that contested prison policy was applied system-wide from "common contentions" provided by plaintiffs in record). At minimum, the meaning of the policy "on paper and in practice" is a disputed material fact that must be determined by a factfinder, making summary judgment inappropriate. *Griffin v. Bryant*, 56 F.4th 328, 338 (4th Cir. 2022) (vacating summary judgment where disputes about the meaning and application of a prison policy existed).

Defendants' refusal to define the outer bounds of the speech ban on appeal only underscores its overbreadth. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.6 (1982) ("[T]he vagueness of a law affects overbreadth analysis. The Court has long recognized that ambiguous meanings cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." (cleaned up)). They use imprecise words to describe the ban, stating that it is "akin to the unauthorized practice of law" or that it "closely mirrors" the unauthorized practice statute. Br.9. To be clear, if Defendants are willing to agree that Offense C20 is limited to prohibiting the unauthorized practice of law, Mr. LaKemper would have no problem with the policy going forward. But they claim instead that the speech ban covers an indeterminate amount of conduct beyond the unauthorized practice prohibition. From Defendants' brief, it is impossible to discern where impermissible speech ends, and permissible speech begins.

## B. The Speech Ban Is Not Justified by Defendants' Purported Penological Interests Under *Turner*

Contrary to Defendants' assertions, all four *Turner* factors weigh against the constitutionality of Defendants' legal speech ban. The ban is an "exaggerated response to [Defendants'] security objectives," and unjustifiably targeted at legal speech. *Turner v. Safley*, 482 U.S. 78, 98 (1987).

### 1. *The speech ban lacks any rational connection to Defendants' purported penological interests*

Although the rational-connection test does not require a perfect means-ends fit between a prison policy and the danger it seeks to prevent, it does forbid policies that "sweep[] much more broadly than can be explained by [Defendants'] penological objectives." *Id.* at 98. The legal speech ban fails that test.

Defendants raise a number of penological interests for the policy, including preventing the unauthorized practice of law, "extortion, bartering, and gang activity," as well as "concealing hidden messages in confidential documents." Br.14-15.[1] But they do not bother to respond to the fact that existing policies already prohibit the illicit conduct that concerns them. Op.Br.28-30. Existing NCDAC policy punishes the unauthorized practice of law, JA116 (Offense B09), bartering, JA117 (Offense C09), extortion, JA115 (Offense A21), participating in a gang, JA115 (Offense A14), exchanging anything of value to perform favors, JA115 (Offense C05), and other communications that jeopardize prison security. JA115 (prohibitions on inciting a riot, work stoppage, or demonstration; communicating about escape; organizing gang activity; making false oral or written allegations about

---

[1] Defendants nowhere explain how communications between incarcerated individuals who are not authorized to practice law would enjoy any confidentiality protections, or how confidential legal documents, once given to a third party, would retain their confidential status.

staff members; verbal intimidation for personal gain; instigating assault); JA116 (prohibitions on soliciting sexual acts; inciting spread of communicable disease; communicating with victims' families); JA117 (prohibitions on causing work stoppages; threatening to harm staff member or civilian; disrespectful oral or written language; soliciting or accepting a bribe; threatening to harm another offender; engaging in any business activity; creating a verbally offensive situation); JA118 (prohibition on forging papers).

As a result, the only additional activities that Offense C20 prohibits is non-disruptive legal speech such as sharing with another individual one's legal difficulties encountered on appeal or explaining to a peer the prison grievance process. There is no logical connection between the cited penological interests and these forms of speech.

Nor do Defendants respond to Plaintiff's argument that they illogically single out legal speech for punishment. Op.Br.29. Prison administrators may only make content-based speech distinctions in their policies "on the basis of their potential implications for prison security . . . ." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989). The legal speech ban lacks any such basis. Common sense dictates that incarcerated individuals can transfer illicit information in everyday non-legal correspondence just as easily as in legal ones; assistance with almost *any* matter can be bartered or extorted; and more inflammatory rhetoric such a discussion of

political texts could pose greater dangers but is not prohibited. *Turner* itself shows the illogic of Defendants' policy. There, the Supreme Court invalidated a prohibition on inmate marriage and rejected the State's asserted justification that such a prohibition was needed to prevent "love triangles" and violent confrontations between prisoners. *Turner*, 482 U.S. at 98–99. The Court reasoned that "inmate rivalries are as likely to develop without a formal marriage ceremony as with one." *Id.*; *see also Jones v. Slade*, 23 F.4th 1124, 1137–38 (9th Cir. 2022) (prison's discriminatory application of a prohibition on explicit material against certain genres of music but not others undercut its security rationale, failing *Turner* neutrality standard). Here, too, there is no logical rationale for singling out legal speech for punishment.

Defendants' other arguments are likewise unavailing. They suggest that the speech ban is justified because North Carolina outlaws even non-incarcerated citizens from the unauthorized practice of law. Br.15. Again, Mr. LaKemper does not challenge the ban on unauthorized practice in prison. Rather, the focus here is the speech ban's far more sweeping prohibition on legal speech. Nor does Defendants' citation to dicta in *Shaw v. Murphy* that "inmate law clerks" can sometimes abuse "the giving and seeking of [legal] assistance" mean prisons can categorically ban such assistance. 532 U.S. 223, 231 (2001) (cleaned up); Br.14-15. *Shaw* merely "decline[d] to cloak the provision of legal assistance with any First

Amendment protection *above and beyond* the protection normally accorded prisoners' speech." *Id.* (emphasis added). Instead, the *Turner* test applies, which, Defendants fail in this case. Finally, Defendants' assertion that NCDAC permits law library clerks to provide legal assistance is factually incorrect. Br.15. Such clerks are "not trained in the law and only provide assistance to those offenders who are unable to read and/or write." JA140.

### 2. Plaintiff lacks adequate alternatives to exercising his First Amendment right to communicate with other incarcerated individuals about legal matters

Defendants' response to the second *Turner* factor fares no better. First, Defendants misconstrue the right at issue. They assert that adequate alternatives exist so long as Mr. LaKemper may "generally engage in legal assistance," particularly with people outside of prison. Br.16-17. But this Court has required the right for *Turner* purposes to be defined based on a "contextualized inquiry." *Heyer v. United States Bureau of Prisons* (*Heyer II*), 984 F.3d 347, 358 (4th Cir. 2021) (noting that the Fourth Circuit "[a]nd some sister circuits have similarly chosen to analyze constitutional rights under *Turner* at a fairly specific level").

Framed correctly, the right at issue in this case is the right to discuss legal matters with other incarcerated people. *Cf. id.* (defining the contested right as deaf prisoner's "ability to communicate with the Deaf community"). This is correct because incarcerated individuals share common questions and knowledge regarding

9

legal matters related to the criminal legal system that those outside prison do not have, such as about how the grievance process works in practice and about facility conditions. The legal speech ban prevents incarcerated individuals from engaging in any discussion that would aid or support another on a legal topic, thus eliminating any alternative means for them to exercise this right.

Defendants' attempt to define the right as concerning legal speech with people outside of prison is unavailing. Br.16. They have no answer for cases like *Heyer v. United States Bureau of Prisons* (*Heyer I*), 849 F.3d 202 (4th Cir. 2017), *Heyer II*, 984 F.3d 347, and *Hum. Rts. Def. Ctr. v. Ishee*, 726 F. Supp. 3d 482 (E.D.N.C. 2024), which all made clear that the right at issue must be defined according to the facts of the plaintiffs' claims. Defendants cite *Nordstrom v. Ryan*, 856 F.3d 1265 (9th Cir. 2017), but that case actually supports Mr. LaKemper's position. There, the right at issue was prisoners' rights to "confidential legal correspondence" with attorneys; the Ninth Circuit specifically rejected the prison officials' argument that "phone calls and in-person meetings" with attorneys were comparable alternatives. *Id.* at 1274. And *Firewalker-Fields v. Lee*, 58 F.4th 104 (4th Cir. 2023) is far afield from this case. There, the plaintiff's complained-of right was exceedingly narrow: he alleged that the prison refused to provide him with prayer services on Fridays at noon. *Id.* at 113. This Court sensibly refused to construe the right as whether the plaintiff could "engage in Friday prayer on his terms, but rather whether he could generally

engage in worship." *Id.* at 117. Here, Mr. LaKemper does not claim a similarly narrow right, but one appropriate to his context: the ability to communicate legal matters with other incarcerated individuals.

But even accepting that the right at issue involves "generally engag[ing] in legal assistance," Br.16-17, there remain genuine disputes of fact that make summary judgment inappropriate. Mr. LaKemper alleges that he has had virtually no success communicating with third parties about legal matters. North Carolina Prisoner Legal Services, the organization designated to assist the State's incarcerated individuals with their legal claims, has consistently denied Mr. LaKemper's requests for assistance and has stated that it was categorically unable to help with conditions of confinement claims. JA434, JA439–446, JA440. Further, Mr. LaKemper has no family or associates with the relevant legal experience to discuss legal matters with, App. Dkt. 7 at 8, and, as his other claims in this lawsuit demonstrate, NCDAC has obstructed his mail communications and retaliated against him when he has sought external legal help. *See infra* at 19, 23. Defendants' assertions that alternatives are available only demonstrate the existence of a factual dispute requiring reversal of the district court's grant of summary judgment.

### 3. *Permitting non-disruptive legal speech would not burden prison administrators*

Third, eliminating the legal speech ban would not overburden prison administrators and could be accomplished at "*de minimis* cost." *Turner*, 482 U.S.

at 91. Defendants claim concern over "an increase in 'extortion, bartering, and gang activity,'" Br.18, but existing prison policies already prohibit that illicit conduct. Consequently, eliminating the speech ban would not increase the security concerns to prisons. To the contrary, it is likely to conserve prison resources by allowing officials to dedicate more time to serious security issues rather than expending energy monitoring, identifying, and punishing non-threatening legal speech.

Nor would prohibiting illicit conduct but permitting non-disruptive legal speech overly burden prison officials with distinguishing between the two. Prison officials regularly distinguish between permissible and impermissible speech and conduct. *See, e.g.*, JA115 (prohibiting "verbal . . . intimidation for personal or financial gain"), JA116 (prohibiting "oral or written language . . . that [is] generally considered disrespectful, profane, lewd, or defamatory"); JA117 (prohibiting "willfully creat[ing] a . . . verbally offensive condition, or situation").

In response, Defendants cite a single lawyer out of context for the puzzling proposition that, without the legal speech ban, prison officials will find it difficult to identify the unauthorized practice of law. Br.19. But NCDAC policy already prohibits incarcerated individuals from violating North Carolina statutes, including the law against unauthorized practice, JA116, thus suggesting that officials can identify such violations. And Defendants' suggestion that incarcerated individuals have creative means to circumvent prison policies amounts to the unremarkable

statement that prisoners sometimes violate prison policy. Br.19. That generic observation cannot justify a sweeping ban on nearly all legal speech. By that logic, no matter what the policy was, individuals would be able to circumvent it.

### 4. *Alternative regulations furthering Defendants' penological aims already exist*

Fourth, Defendants fail to recognize that easy and obvious alternatives serving their penological interests already exist. NCDAC's existing prohibitions already serve as ready alternatives to prohibit all the problematic conduct Defendants seek to address. They are thus wrong to claim Mr. LaKemper's position "would still allow for impermissible legal advice by non-lawyer inmates so long as they did not accept compensation," and allow "the concealed passing of information about security-sensitive issues." Br.21; *see supra* at 6-7 (listing prohibitions on unauthorized practice of law an on illicit communications).

Moreover, the experience of other states confirms that North Carolina's legal speech ban is unnecessary to address legitimate security confirms. As described in the opening brief, North Carolina is the only state in the Fourth Circuit with a sweeping ban on legal speech. Maryland's, South Carolina's, and West Virginia's prison policies do not even mention legal assistance, and Virginia only prohibits "charging or accepting any compensation for legal assistance." Op.Br.6 (citing policies).

### 5. *There is a dispute of fact as to whether Plaintiff exhausted available administrative remedies*

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust "such administrative remedies as are available" prior to filing suit in federal court challenging prison conditions. 42 U.S.C. § 1997e(a). Failure to exhaust is an affirmative defense that prison officials have the burden to prove. *Jones v. Bock*, 549 U.S. 199, 212 (2007). Defendants fail to meet that burden at the summary judgment stage. Because prison officials made further appeal of Mr. LaKemper's 2015 grievance unavailable to him and because he submitted a 2019 grievance addressing legal speech issues, there is at least a dispute of fact as to whether Mr. LaKemper exhausted all remedies actually available to him. *See Gowen v. Winfield*, 130 F.4th 162, 177 (4th Cir. 2025) (vacating summary judgment where disputes of fact remained as to whether administrative remedies were available to plaintiff); *Griffin*, 56 F.4th at 338–39 (same).

To satisfy the PLRA's exhaustion requirement, an incarcerated individual must generally "have utilized all available remedies 'in accordance with the [prison's] applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). The touchstone of exhaustion is notice: its purpose is to "allow[] a prison to address complaints about the program it administers before being subjected to suit." *Moore*,

517 F.3d at 726 (quoting *Jones*, 549 U.S. at 219); *see Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017) ("[O]nce a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." (quoting *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013))). What exhaustion procedures are "available," however, depends on context. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725; *see Ross v. Blake*, 578 U.S. 632, 642 (2016) ("[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." (cleaned up)).

Defendants argue that Mr. LaKemper failed to exhaust his claims, but he in fact pursued all remedies *available* to him through his grievances filed in 2015 and 2019. *Moore*, the lone Fourth Circuit decision cited by Defendants on this point, actually strongly supports Mr. LaKemper's case. In *Moore*, this Court considered whether a plaintiff incarcerated in North Carolina exhausted available procedures. 517 F.3d at 717. The plaintiff had sued prison officials on a number of claims, including for retaliation alleging that officials transferred him to a maximum-security prison, placed him in harmful cell conditions, and revoked his privileges, all without explanation. *Id.* 721. He submitted a grievance complaining of these abuses, but it "was rejected the day after it was submitted . . . because it concerned

more than one issue." *Id.* at 722 (cleaned up). Nonetheless, this Court considered the retaliation claim exhausted because the one-issue-at-a-time requirement rendered the grievance process effectively unavailable for his particular claim. *Id.* at 730. It reasoned that the plaintiff's "grievance was a complaint about being punished in various ways for conduct that he had never been informed of or charged with. Under these circumstances, requiring [him] to grieve each of the alleged components of his punishment separately would have prevented him from fairly presenting his claim in its entirety." *Id.*

Similar facts hold in this case. Defendants do not contest that on October 3, 2015, Mr. LaKemper submitted a grievance complaining of the legal speech ban (then labeled offense "D16") and the "speech implications" of such a ban given that NCDAC had also banned law libraries. JA387–388; Dist. Dkt 78 at 3 (MSJ Opp.) ("Plaintiffs' included reference to not having law library access was meant to illustrate the legal-discussion need."). NCDAC, however, rejected the grievance because it concerned more than one incident. *Id.* Like in *Moore*, the one-issue-at-a-time rule was applied erroneously. Mr. LaKemper was not complaining about the legal speech ban and the lack of law libraries separately, but arguing that, together, they comprehensively restricted access to legal advice and left him without adequate alternatives to exercise his rights. And like in *Moore*, forcing Mr. LaKemper to

grieve each component separately "would have prevented him from fairly presenting his claim in its entirety." 517 F.3d at 730.

Mr. LaKemper's December 14, 2019, grievance eliminates any doubt that NCDAC was on notice about the lack of alternatives to legal speech. That grievance, which Defendants admit was exhausted, Br.21, complained of the "blanket ban on law libraries" as well as the lack of any "reasonable substitute." JA430. Indeed, Mr. LaKemper's Amended Complaint expressly frames his claim against the legal speech ban as an instance of NCDAC eliminating reasonable substitutes. Dist. Dkt. 20 ¶ 16 ("Plaintiff hereby challenges the unconstitutionality of the . . . . [p]rohibition on prisoners assisting one another with legal matters as being overly broad, unreasonably suppressive of free speech, and fundamentally flawed in light of the blanket-ban [on law libraries] and absence of meaningful substitute[s]."). Although that grievance did not specifically mention the legal speech ban, its reference to inadequate alternatives to legal speech, in combination with the 2015 grievance, was sufficient to put NCDAC on notice of the legal speech ban's unconstitutionality. *See Carter v. Fleming*, 879 F.3d 132, 136 n.2 (4th Cir. 2018) ("[W]hile Carter's grievance was not a model of clarity, we conclude that it did provide prison officials sufficient notice of these complaints.").

### 6. Plaintiff's claim is not time barred

Nor does the statute of limitations bar Mr. LaKemper's claim, because the legal speech ban is a continuing violation of his First Amendment rights. Under the continuing-violation doctrine, courts "examine the wrong alleged by [the Plaintiff] to determine if the purported violation is the result of 'continual unlawful acts,' each of which restarts the running of the statute of limitations . . . .'" *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179 (2003) (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)).

Although Mr. LaKemper first put NCDAC on notice that the speech ban was unlawful in 2015, the violations from that policy were continuing. Mr. LaKemper alleges that he and other individuals were chilled in the exercise of their speech rights, often self-censoring as to all legal speech. JA389. And he alleges that on four separate occasions in 2020 and 2021, prison officials sanctioned him for communicating about legal matters in violation of the legal speech ban. JA390, Dist. Dkt. 20 ¶ 13 (Amended Compl.). Each of these discrete acts restarted the clock, rendering this suit—filed on February 25, 2020—timely. JA13. And Mr. LaKemper did not need to grieve these individual violations because, "to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Wilcox*, 877 F.3d at 167 n.4 (cleaned up).

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S MAIL INTERFERENCE CLAIM

Defendants misapply Section 1983 law and ignore disputes of material fact as to TextBehind's practice of depriving incarcerated individuals of non-privileged legal papers in violation of the First Amendment.

### A. Defendant Ishee is Directly Liable for TextBehind's Policies and Practices

At the threshold, Defendants' brief reflects a fundamental misunderstanding of government liability under Section 1983. It is axiomatic that states cannot insulate themselves from the Constitution's protections simply by delegating their constitutional duties to third parties. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although [a contractor] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [contractor]. In that sense, the county's duty is non-delegable."). Were it otherwise, state officials would be able to launder all types of unconstitutional conduct through private contractors.

Mr. LaKemper alleges that Defendant Ishee is directly liable for the mishandling of his non-privileged legal papers, and Defendants ignore the cases that make clear that state actors may be directly liable for the actions of private parties. *See* Op.Br.38–39 (collecting cases). On the first theory, state actors face Section

1983 liability for the unconstitutional actions of their contractors when they allow contractors to "exercise[] powers that are traditionally the exclusive prerogative of the state." *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 456 F. Supp. 3d 699, 707–08 (D. Md. 2020), *rev'd and remanded on other grounds*, 2 F.4th 330 (4th Cir. 2021); *see also Scott v. Clarke*, 64 F. Supp. 3d 813, 821 (W.D. Va. 2014) ("Although [the contractor was] contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [contractor]." (quoting *Ancata*, 769 F.2d at 705)). On the second theory, "where a governmental entity delegates the final authority to make decisions[,] then those decisions necessarily represent official policy." *Ancata*, 769 F.2d at 705 n.9; *see also King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (noting that the "underlying rationale is not based on *respondeat superior* but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it"). Notably, both are theories of *direct* liability, not *respondeat superior*. *See Ancata*, 769 F.2d at 704–05; *King*, 680 F.3d at 1020.

Just as prison officials remain directly liable for the unconstitutional policies and practices of a third-party medical provider, so too are they liable for the policies and practices of a third-party mail processor. Like prison medical care, processing mail in prison is an exclusive prerogative of the state. Here, Defendant Ishee

delegated that prerogative to TextBehind. As a result, TextBehind's policies and practices "effectively bec[ame] and constitute[d]" Ishee's policies and decisions. *Scott*, 64 F. Supp. 3d at 821. He is thus directly liable for the policies and practices of TextBehind.

Defendants' responses to the contrary entirely miss the point. They argue that the named Defendants lack personal involvement in any alleged constitutional violation and that TextBehind should have been a Defendant instead. Br.25. But Mr. LaKemper argues that Defendant Ishee was personally involved *in the creation and implementation of a policy that delegated mail processing to TextBehind*. Op.Br.40–41. This delegation of an exclusive government function is what renders him liable for the unconstitutional customs and practices of TextBehind. Plaintiff's theory is distinct from one arguing that TextBehind's conduct constitutes state action, in which case TextBehind would be the proper defendant. Nor is Defendants' argument that Section 1983 precludes *respondeat superior* liability responsive. Br.26. The two theories of liability Mr. LaKemper advances are theories of *direct* liability, not *respondeat superior*.

### B. There is an Issue of Material Fact as to Whether TextBehind Maintains an Unconstitutional Practice of Rejecting Non-Privileged Legal Material

Defendants and the district court also overlook record evidence of TexBehind's unwritten custom or practice of interfering with non-privileged legal

materials. Failure or refusal to deliver incoming mail constitute First Amendment violations so long as they surpass a mere "occasional, negligent delay." *Jones v. Hamilton*, Case No. 7:23CV00016, 2024 WL 1959289, at *3 (W.D. Va. May 2, 2024).

Although TextBehind's stated policy allows for the processing of non-privileged mail containing legal material, record evidence of Mr. LaKemper's experience and that of his peers shows that its customs and practices do not align with its stated policies. On more than a dozen occasions, TextBehind withheld non-privileged legal materials sent to Mr. LaKemper and other incarcerated individuals. JA377, JA392, JA395–418. Viewing the evidence in the light most favorable to Mr. LaKemper, there is a triable issue of fact as to whether TextBehind maintains a custom or practice of rejecting non-privileged legal material.

Defendants claim that five isolated instances of mishandled mail do not rise to a constitutional violation. Br.26–27. For one, Defendants miscount. Mr. LaKemper alleges that his mail was improperly withheld on five occasions, JA377, JA392, *and* presents unrebutted attestations that on at least eleven separate occasions, eight other incarcerated individuals had their non-privileged legal materials improperly withheld. JA395–418. Defendants do not explain why evidence from other incarcerated individuals should not count to establish the existence of a practice or custom. For another, Defendants are wrong on the law.

Courts often hold that five instances of improper mail disruption or less can be sufficient to state a First Amendment claim. *See, e.g.*, *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1212 (9th Cir. 2017) (two instances); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (two instances); *Kensu v. Haigh*, 87 F.3d 172, 174–75 (6th Cir. 1996) (one instance); *Grenning v. Klemme*, 34 F. Supp. 3d 1144, 1156 (E.D. Wash. 2014) (five pieces).

## C. Defendants do not contest that a practice of rejecting non-privileged legal materials is unconstitutional under *Turner*

Finally, Defendants do not contest that if TextBehind maintains a custom or practice of rejecting non-privileged mail containing legal materials, it would fail to satisfy the requirements of *Turner*. Nor could they, as there is no penological justification—let alone a legitimate one—for the rejection of non-privileged legal mail containing legal material. The practice ostensibly violates both TextBehind's and NCDAC's written policy, rendering it arbitrary and unconnected to any "legitimate penological interest[]." *Turner*, 482 U.S. at 89.

## III. THE DISTRICT COURT ERRED BY AWARDING SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM

Defendant Owens retaliated against Mr. LaKemper for his lawsuits against NCDAC by denying Mr. LaKemper's perfectly legitimate request to send his own funds to an outside paralegal service for legal research and copies of legal material. Defendants correctly recognize that Mr. LaKemper's litigation against NCDAC is

protected First Amendment activity. Br.29. But they otherwise repeat the district court's erroneous reasoning and fail to explain the litany of post-hoc and shifting justifications that Defendant Owens gave to rationalize his retaliatory conduct.

### A. There is a Dispute of Fact as to Whether Denying Mr. LaKemper's Special Draw Request Constituted an Adverse Action

To state a claim for First Amendment retaliation, Mr. LaKemper must show that Defendants "took some action that adversely affected [his] First Amendment rights." *Martin v. Duffy* (*Martin II*), 977 F.3d 294, 299 (4th Cir. 2020) (quotation marks omitted). The "adverse action" standard is not a high bar. It requires only that a plaintiff show he "suffered . . . more than a *de minimis* inconvenience," *ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993), and that "the defendant's allegedly retaliatory conduct would likely deter a 'person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy (Martin I)*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)).

Here, a factfinder could easily find that Defendant Owens's denial of Mr. LaKemper's special draw request constituted an adverse action. As a result of the denial, Mr. LaKemper struggled to obtain the needed documents, JA393–394, and was unable to effectively present his Industrial Commission negligence claim, which was dismissed later that year. JA393–394, JA770. This Court has held several times that an adverse action may consist of the denial or withdrawal of certain

discretionary benefits by a government actor. *See Constantine*, 411 F.3d at 500–01 (denying student her request to sit for re-examination); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686–87 (4th Cir. 2000) (terminating public benefits). The denial, along with the unusual circumstances surrounding the special draw denial would have indicated to someone in Mr. LaKemper's position that the denial was "intended to be punitive," and thus an adverse action. Op.Br.53-54; *see Jones v. Solomon*, 90 F.4th 198, 215 (4th Cir. 2024).

Defendants have no meaningful response to any of these arguments. They assert that the denial would not deter a person of ordinary firmness from continuing to file lawsuits and note that Mr. LaKemper has filed additional grievances and lawsuits since. Br.29–30. But this argument misses the point. As Defendants acknowledge, the adverse action standard is an objective one, rather than subjective. Br.29 ("The [adverse action] prong requires an objective test"). It is not "necessary that the prisoner succumb entirely or even partially" to the defendant's retaliation. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). Even if "it is true that [Mr. LaKemper] himself was apparently not deterred . . . , his own reaction is not dispositive. At most, it creates a genuine dispute of fact as to whether the [denial] constituted an adverse action." *Solomon*, 90 F.4th at 198 (quotation marks and citation omitted).

### B. Disputes of Fact Exist as to Whether Defendant Owens's Proffered Rationales for Denying the Special Draw Request Were Pretextual

Mr. LaKemper's "protected conduct was [also] a substantial or motivating factor in [Owens's] decision to take adverse action . . . ." *Martin II*, 977 F.3d at 299. Defendants insist that Owens's denial of the special draw request was permissible because he was simply following policy. Br.31. But they ignore the mountain of evidence indicating that Owens's rationales for denying the special draw request were pretextual.

It is well-recognized that "shifting and inconsistent justifications" are "probative of pretext." *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) (cleaned up). So too are post-hoc justifications offered after the adverse action has taken place or the plaintiff has sought redress. *Id.* ("[A] factfinder may infer that an employer's post-hoc rationale is not a legitimate explanation for an adverse employment decision."). Mr. LaKemper documents in his principal brief a total of *eleven* unique reasons that Owens and his agents gave for rejecting Mr. LaKemper's special draw request, some of which were also offered post-hoc. Op. Br.52–53. Defendants have no response to these shifting justifications.

In fact, Defendants again offer shifting justifications in their brief. Initially, Defendants claim that the district court was correct in stating that the request was denied for "lack[ing] a requisite order form" and because it was "not for an enumerated purpose listed in the facility's standard operating procedures." Br.29. But two pages later, Defendants claim a different reason for the denial: that the

facility "did not permit Plaintiff to fund non-attorney legal services or accounts that could incur debts." Br.31.

At a minimum, a dispute of fact exists as to whether Mr. LaKemper's special draw request actually violated facility policy. Only two subsections of the Special Draw policy require a "bill, invoice, or statement": if money is being sent to an "individual" or to a "church, organization, or any type of group." JA147. The company Mr. LaKemper requested to send funds to is neither an individual nor a "type of group" akin to a church—it is a business providing paralegal services. *Compare* JA74 *with* JA369. And although the policy enumerates a list of purposes for which funds can be sent, JA146–147, evidence indicates that the list is not exhaustive. JA393. Given the uncertainties about the meaning of this policy in practice, summary judgment was improper, and a factfinder should determine whether Owens's proffered justifications were pretextual.

## IV. DEFENDANTS HAVE WAIVED THEIR QUALIFIED IMMUNITY DEFENSE, WHICH FAILS IN ANY EVENT

Defendants do not seriously raise a qualified immunity defense on appeal. Their argument amounts to two conclusory sentences: "Defendants did not violate any of Plaintiff's clearly established constitutional rights. However, if the Court finds that Defendants violated Plaintiff's constitutional rights, such rights were not clearly established at the time." Br.32. But "'[a] party waives an argument by . . . failing to develop its argument—even if its brief takes a passing shot at the issue.'"

*Short v. Hartman*, 87 F.4th 593, 615 (4th Cir. 2023) (declining to decide qualified immunity issue because it was not properly presented and quoting *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)). This cursory treatment of the issue constitutes waiver on appeal.

Even were the Court to reach the issue, each of Mr. LaKemper's rights were clearly established at the time they were violated. "A right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity," or if there is a "consensus of cases of persuasive authority from other jurisdictions," even if no controlling authority holds that conduct identical to the conduct at issue is unlawful. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017) (quotation marks and citations committed).

It is clearly established that (1) incarcerated individuals have a right to communicate with their peers in prison, *Turner* 482 U.S. at 91, including about legal matters, *Shaw*, 532 U.S. at 228; (2) that they maintain a First Amendment right to send and receive mail, *Thornburgh*, 490 U.S. at 407, including "[t]he right of a prisoner to receive materials of a legal nature." *Kensu*, 87 F.3d at 174; and (3) that incarcerated individuals have a right to file suit and access the courts free from retaliation. *Booker*, 855 F.3d at 544.

## CONCLUSION

For the reasons above, the district court's decision granting summary judgment should be reversed.

Dated: July 11, 2025

Respectfully submitted,

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

*Lydia Hill, Emily Luong, and Alessandra Quattrocchi, law student advocates, assisted in the preparation of this brief*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,469 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: July 11, 2025

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I certify that on July 11, 2025, I electronically filed the foregoing Reply Brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: July 11, 2025

/s/ *David Chen*
DAVID CHEN
WASHINGTON SQUARE LEGAL SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, NY 10012
(908) 240-6252
*davidchen@nyu.edu*

*Counsel for Plaintiff-Appellant*